IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-3322
_____


FLORENCE B. CORCORAN
Wife of/and WAYNE D. CORCORAN,

                         Plaintiffs-Appellants,

v.

UNITED HEALTHCARE, INC.,
and BLUE CROSS and BLUE SHIELD
OF ALABAMA, INC.,

                         Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
(June 26, 1992)

Before THORNBERRY, KING, and DeMOSS, Circuit Judges.

KING, Circuit Judge:

     This appeal requires us to decide whether ERISA pre-empts a state-law malpractice action brought by the beneficiary of an ERISA plan against a company that provides "utilization review" services to the plan. We also address the availability under ERISA of extracontractual damages. The district court granted the defendants' motion for summary judgment, holding that ERISA both pre-empted the plaintiffs' medical malpractice claim and precluded them from recovering emotional distress damages. We affirm.

# I. BACKGROUND

The basic facts are undisputed.  Florence Corcoran, a long-time employee of South Central Bell Telephone Company (Bell), became pregnant in early 1989.  In July, her obstetrician, Dr. Jason Collins, recommended that she have complete bed rest during the final months of her pregnancy.  Mrs. Corcoran applied to Bell for temporary disability benefits for the remainder of her pregnancy, but the benefits were denied.  This prompted Dr. Collins to write to Dr. Theodore J. Borgman, medical consultant for Bell, and explain that Mrs. Corcoran had several medical problems which placed her "in a category of high risk pregnancy."  Bell again denied disability benefits.  Unbeknownst to Mrs. Corcoran or Dr. Collins, Dr. Borgman solicited a second opinion on Mrs. Corcoran's condition from another obstetrician, Dr. Simon Ward.  In a letter to Dr. Borgman, Dr. Ward indicated that he had reviewed Mrs. Corcoran's medical records and suggested that "the company would be at considerable risk denying her doctor's recommendation."  As Mrs. Corcoran neared her delivery date, Dr. Collins ordered her hospitalized so that he could monitor the fetus around the clock.[1]

Mrs. Corcoran was a member of Bell's Medical Assistance Plan (MAP or "the Plan").  MAP is a self-funded welfare benefit plan which provides medical benefits to eligible Bell employees.  It

_____

[1]  This was the same course of action Dr. Collins had ordered during Mrs. Corcoran's 1988 pregnancy.  In that pregnancy, Dr. Collins intervened and performed a successful Caesarean section in the 36th week when the fetus went into distress.

is administered by defendant Blue Cross and Blue Shield of Alabama (Blue Cross) pursuant to an Administrative Services Agreement between Bell and Blue Cross.  The parties agree that it is governed by ERISA.[2]  Under a portion of the Plan known as the "Quality Care Program" (QCP), participants must obtain advance approval for overnight hospital admissions and certain medical procedures ("pre-certification"), and must obtain approval on a continuing basis once they are admitted to a hospital ("concurrent review"), or plan benefits to which they otherwise would be entitled are reduced.

QCP is administered by defendant United HealthCare (United) pursuant to an agreement with Bell.  United performs a form of cost-containment services that has commonly become known as "utilization review."  See Blum, An Analysis of Legal Liability in Health Care Utilization Review and Case Management, 26 Hous. L. Rev. 191, 192-93 (1989) (utilization review refers to "external evaluations that are based on established clinical criteria and are conducted by third-party payors, purchasers, or health care organizers to evaluate the appropriateness of an episode, or series of episodes, of medical care.").  The Summary Plan Description (SPD) explains QCP as follows:

> The Quality Care Program (QCP), administered by United HealthCare, Inc., assists you and your covered dependents in securing quality medical care according to the provisions of the Plan while helping reduce risk and expense due to unnecessary hospitalization and surgery.  They do this by providing you with information which will permit you (in

[2]  Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829, 29 U.S.C. §§ 1001-1461.

consultation with your doctor) to evaluate alternatives to surgery and hospitalization when those alternatives are medically appropriate.  In addition, QCP will monitor any certified hospital confinement to keep you informed as to whether or not the stay is covered by the Plan.

Two paragraphs below, the SPD contains this statement: **When reading this booklet, remember that all decisions regarding your medical care are up to you and your doctor.**  It goes on to explain that when a beneficiary does not contact United or follow its pre-certification decision, a "QCP Penalty" is applied.  The penalty involves reduction of benefits by 20 percent for the remainder of the calendar year or until the annual out-of-pocket limit is reached.  Moreover, the annual out-of-pocket limit is increased from $1,000 to $1,250 in covered expenses, not including any applicable deductible.  According to the QCP Administrative Manual, the QCP penalty is automatically applied when a participant fails to contact United.  However, if a participant complies with QCP by contacting United, but does not follow its decision, the penalty may be waived following an internal appeal if the medical facts show that the treatment chosen was appropriate.

A more complete description of QCP and the services provided by United is contained in a separate booklet.  Under the heading "WHAT QCP DOES" the booklet explains:

Whenever your doctor recommends surgery or hospitalization for you or a covered dependent, QCP will provide an independent review of your condition (or your covered dependent's).  The purpose of the review is to assess the need for surgery or hospitalization and to determine the appropriate length of stay for a hospitalization, based on nationally accepted medical guidelines.  As part of the review process, QCP will discuss with your doctor the

4

> appropriateness of the treatments recommended and the availability of alternative types of treatments -- or locations for treatment -- that are equally effective, involve less risk, and are more cost effective.

The next paragraph is headed "INDEPENDENT, PROFESSIONAL REVIEW" and states:

> United Health Care, an independent professional medical review organization, has been engaged to provide services under QCP. United's staff includes doctors, nurses, and other medical professionals knowledgeable about the health care delivery system. Together with your doctor, they work to assure that you and your covered family members receive the most appropriate medical care.

At several points in the booklet, the themes of "independent medical review" and "reduction of unnecessary risk and expense" are repeated. Under a section entitled "THE QUALITY CARE PROGRAM...AT A GLANCE" the booklet states that QCP "Provides independent, professional review when surgery or hospitalization is recommended -- to assist you in making an enlightened decision regarding your treatment." QCP "provides improved quality of care by eliminating medically unnecessary treatment," but beneficiaries who fail to use it "may be exposed to unnecessary health risks. . . ." Elsewhere, in the course of pointing out that studies show one-third of all surgery may be unnecessary, the booklet explains that programs such as QCP "help reduce unnecessary and inappropriate care and eliminate their associated costs." Thus, "one important service of QCP will help you get a second opinion when your doctor recommends surgery."

The booklet goes on to describe the circumstances under which QCP must be utilized. When a Plan member's doctor recommends admission to the hospital,

5

> [i]ndependent medical professionals will review, with the patient's doctor, the medical findings and the proposed course of treatment, including the medically necessary length of confinement. The Quality Care Program may require additional tests or information (including second opinions), when determined necessary during consultation between QCP professionals and the attending physician.

When United certifies a hospital stay, it monitors the continuing necessity of the stay. It also determines, for certain medical procedures and surgeries, whether a second opinion is necessary, and authorizes, where appropriate, certain alternative forms of care. Beneficiaries are strongly encouraged to use QCP to avoid loss of benefits: "'fully using' QCP means following the course of treatment that's recommended by QCP's medical professionals."

In accordance with the QCP portion of the plan, Dr. Collins sought pre-certification from United for Mrs. Corcoran's hospital stay. Despite Dr. Collins's recommendation, United determined that hospitalization was not necessary, and instead authorized 10 hours per day of home nursing care.[3] Mrs. Corcoran entered the hospital on October 3, 1989, but, because United had not pre-certified her stay, she returned home on October 12. On October 25, during a period of time when no nurse was on duty, the fetus went into distress and died.

Mrs. Corcoran and her husband, Wayne, filed a wrongful death action in Louisiana state court alleging that their unborn child died as a result of various acts of negligence committed by Blue Cross and United. Both sought damages for the lost love, society

---

[3] The record does not reveal the name of the person or persons at United that made the decision concerning Mrs. Corcoran.

6

and affection of their unborn child.  In addition, Mrs. Corcoran sought damages for the aggravation of a pre-existing depressive condition and the loss of consortium caused by such aggravation, and Mr. Corcoran sought damages for loss of consortium.  The defendants removed the action to federal court on grounds that it was pre-empted by ERISA[4] and that there was complete diversity among the parties.

Shortly thereafter, the defendants moved for summary judgment.  They argued that the Corcorans' cause of action, properly characterized, sought damages for improper handling of a claim from two entities whose responsibilities were simply to administer benefits under an ERISA-governed plan.  They contended that their relationship to Mrs. Corcoran came into existence solely as a result of an ERISA plan and was defined entirely by the plan.  Thus, they urged the court to view the claims as "relating to" an ERISA plan, and therefore within the broad scope of state law claims pre-empted by the statute.  In their opposition to the motion, the Corcorans argued that "[t]his case essentially boils down to one for malpractice against United HealthCare. . . ."  They contended that under this court's analysis in Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc., 793 F.2d 1456 (5th Cir. 1986), cert. denied, 479 U.S. 1034 (1987), their cause of action must be

---

[4]  See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 66 (1987) (because ERISA pre-emption is so comprehensive, pre-emption defense provides sufficient basis for removal to federal court notwithstanding "well-pleaded complaint" rule).

7

classified as a state law of general application which involves an exercise of traditional state authority and affects principal ERISA entities in their individual capacities. This classification, they argued, together with the fact that pre-emption would contravene the purposes of ERISA by leaving the Corcorans without a remedy, leads to the conclusion that the action is permissible notwithstanding ERISA.

The district court, relying on the broad ERISA pre-emption principles developed by the Supreme Court and the Fifth Circuit, granted the motion. The court noted that ERISA pre-emption extends to state law claims "'of general application,' including tort claims where ERISA ordinarily plays no role in the state law at issue." (citing Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58 (1987) and Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987)). The court found that the state law claim advanced by the Corcorans "relate[d] to" the employee benefit plan (citing the statutory pre-emption clause, ERISA § 514(a)), and therefore was pre-empted, because

> [b]ut for the ERISA plan, the defendants would have played no role in Mrs. Corcoran's pregnancy; the sole reason the defendants had anything to do with her pregnancy is because the terms of the ERISA plan directed Mrs. Corcoran to the defendants (or at least to United HealthCare) for approval of coverage of the medical care she initially sought.

The court held that, because the ERISA plan was the source of the relationship between the Corcorans and the defendants, the Corcorans' attempt to distinguish United's role in paying claims from its role as a source of professional medical advice was unconvincing.

8

The Corcorans filed a motion for reconsideration under Rule 59 of the Federal Rules of Civil Procedure. They did not ask the district court to reconsider its pre-emption ruling, but instead contended that language in the district court's opinion had implicitly recognized that they had a separate cause of action under ERISA's civil enforcement mechanism, § 502(a)(3).[5] They argued that the Supreme Court's decision in <u>Massachusetts Mutual Life Ins. Co. v. Russell</u>, 473 U.S. 134 (1985), did not foreclose the possibility that compensatory damages such as they sought constituted "other appropriate equitable relief" available under § 502(a)(3) for violations of ERISA or the terms of an ERISA plan. The district court denied the motion. Although the court recognized that there was authority to the contrary, it pointed out that "[t]he vast majority of federal appellate courts have . . . held that a beneficiary under an ERISA health plan may not recover under section 509(a)(3) [sic] of ERISA compensatory or consequential damages for emotional distress or other claims beyond medical expenses covered by the plan." (citations omitted). Moreover, the court pointed out, a prerequisite to recovery under § 502(a)(3) is a violation of the terms of ERISA itself. ERISA does not place upon the defendants a substantive

---

[5] The district court had stated that "[b]ecause the plaintiffs concede that the defendants have fully paid any and all medical expenses that Mrs. Corcoran actually incurred that were covered by the plan, the plaintiffs have no remaining claims under ERISA." In a footnote, the court indicated that Mrs. Corcoran could have (1) sued under ERISA, before entering the hospital, for a declaratory judgment that she was entitled to hospitalization benefits; or (2) gone into the hospital, incurred out-of-pocket expenses, and sued under ERISA for these expenses.

responsibility in connection with the provision of medical advice which, if breached, would support a claim under § 502(a)(3). The court entered final judgment in favor of Blue Cross and United, and this appeal followed.

## II. <u>STANDARD OF REVIEW</u>

Because this case is on appeal from the district court's grant of summary judgment, our review is plenary. <u>Dorsett v. Board of Trustees for State Colleges & Universities</u>, 940 F.2d 121, 123 (5th Cir. 1991). We view the evidence in the light most favorable to the nonmoving party, <u>id.</u>, and must affirm if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As this case currently stands, the parties dispute not the relevant facts, but the legal conclusions that must be applied to those facts. As the Corcorans put it, "[t]he question on appeal is whether the plaintiffs are afforded any relief, under state law or ERISA, for damages caused by [the defendants' actions]."

## III. <u>PRE-EMPTION OF THE STATE LAW CAUSE OF ACTION</u>

### A. <u>The Nature of the Corcorans' State Law Claims</u>

The Corcorans' original petition in state court alleged that acts of negligence committed by Blue Cross and United caused the

10

death of their unborn child.  Specifically, they alleged that Blue Cross wrongfully denied appropriate medical care, failed adequately to oversee the medical decisions of United, and failed to provide United with Mrs. Corcoran's complete medical background.  They alleged that United wrongfully denied the medical care recommended by Dr. Collins and wrongfully determined that home nursing care was adequate for her condition.  It is evident that the Corcorans no longer pursue any theory of recovery against Blue Cross.  Although they mention in their appellate brief the fact that they asserted a claim against Blue Cross, they challenge only the district court's conclusion that ERISA pre-empts their state law cause of action against United.[6]  We, therefore, analyze solely the question of pre-emption of the claims against United.  See Hulsey v. State of Texas, 929 F.2d 168, 172 (5th Cir. 1991) (issues stated but not briefed need not be considered on appeal).

The claims against United arise from a relatively recent phenomenon in the health care delivery system -- the prospective review by a third party of the necessity of medical care.  Systems of prospective and concurrent review, rather than traditional retrospective review, were widely adopted throughout the 1980s as a method of containing the rapidly rising costs of health care.  Blum, supra, at 192; Furrow, Medical Malpractice and Cost Containment: Tightening the Screws, 36 Case Western L.

---

[6]  They also do not mention Blue Cross when arguing that extracontractual damages are available under § 502(a)(3).

11

Rev. 985, 986-87 (1986).  Under the traditional retrospective system (also commonly known as the fee-for-service system), the patient obtained medical treatment and the insurer reviewed the provider's claims for payment to determine whether they were covered under the plan.  Denial of a claim meant that the cost of treatment was absorbed by an entity other than the one designed to spread the risk of medical costs -- the insurer.

Congress's adoption in 1983 of a system under which hospitals are reimbursed for services provided to Medicare patients based upon average cost calculations for patients with particular diagnoses spurred private insurers to institute similar programs in which prospective decisions are made about the appropriate level of care.  Although plans vary, the typical prospective review system requires some form of pre-admission certification by a third party (e.g., the HMO if an HMO-associated doctor provides care; an outside organization such as United if an independent physician provides care) before a hospital stay.  Concurrent review involves the monitoring of a hospital stay to determine its continuing appropriateness.  See generally, Blum, supra, at 192-93; Tiano, The Legal Implications of HMO Cost Containment Measures, 14 Seton Hall Legis. J. 79, 80 (1990).  As the SPD makes clear, United performs this sort of prospective and concurrent review (generically, "utilization review") in connection with, inter alia, the hospitalization of Bell employees.

12

The Corcorans based their action against United on Article 2315 of the Louisiana Civil Code, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  Article 2315 provides parents with a cause of action for the wrongful death of their unborn children, Danos v. St. Pierre, 402 So. 2d 633, 637-38 (La. 1981), and also places liability on health care providers when they fail to live up to the applicable standard of care. Chivleatto v. Divinity, 379 So. 2d 784, 786 (La. Ct. App. 4th Dist. 1979).  Whether Article 2315 permits a negligence suit against a third party provider of utilization review services, however, has yet to be decided by the Louisiana courts.  The potential for imposing liability on these entities is only beginning to be explored, with only one state explicitly permitting a suit based on a utilization review company's allegedly negligent decision about medical care to go forward. Wilson v. Blue Cross of So. California, 22 Cal. App. 3d 660, 271 Cal. Rptr. 876, 883 (1990) (reversing summary judgment for utilization review company which determined that further hospitalization was not necessary; ERISA not implicated);[7] see also Wickline v. State of California, 192 Cal. App. 3d 1630, 239 Cal. Rptr. 810, 819 (1986) (stating, in dicta, that negligent implementation of cost containment mechanisms such as utilization

_____

[7]  The case went to trial, but the plaintiff settled with Western Medical, the provider of utilization review services. See Milt Freudenheim, When Treatment and Costs Collide, N.Y. Times, Apr. 28, 1992, at C2 col. 1.

13

review can lead to liability; ERISA not implicated), <u>cert. granted</u>, 727 P.2d 753, 231 Cal. Rptr. 560, <u>review dismissed, cause remanded</u>, 741 P.2d 613, 239 Cal. Rptr. 805 (1987).[8]

In the absence of clear Louisiana authority for their lawsuit, the Corcorans rely on <u>Green v. Walker</u>, 910 F.2d 291 (5th Cir. 1990). We held in <u>Green</u> that Article 2315 imposes a duty of due care upon physicians hired by employers to conduct employment-related exams on employees. <u>Id.</u> at 296. The cause of action recognized in <u>Green</u>, however, is not analogous to the

_____

[8] Numerous commentators have weighed in on the propriety of liability for utilization review decisions. <u>See</u> <u>e.g.</u>, Macaulay, <u>Health Care Cost Containment and Medical Malpractice: On a Collision Course</u>, 19 Suffolk U.L. Rev. 91, 106-107 (1986) (arguing for higher standard of negligence in "<u>Wickline</u> suits"); Morreim, <u>Cost Containment and the Standard of Medical Care</u>, 75 Calif. L. Rev. 1719, 1749-50 (1987) (arguing that liability should be limited because patient's physician makes the ultimate decision about treatment); Note, <u>Paying the Piper: Third Party Payor Liability for Medical Treatment Decisions</u>, 25 Ga. L. Rev. 861, 907-911 (1991) (by David Griner) (arguing that without liability for negligence in utilization review decisions, third party payors have incentives to control costs but not to use reasonable care in the decisionmaking process); Mellas, <u>Adapting the Judicial Approach to Medical Malpractice Claims Against Physicians to Reflect Medicare Cost Containment Measures</u>, 62 U. Colo. L. Rev. 287, 316 (1991) (liability will reduce possibility that poor medical decisions will be made in order to cut costs).

Even if courts put their imprimatur on negligence actions against utilization review organizations, plaintiffs would face difficulties in proving that the organization's decision was a significant cause of an injury. <u>See</u> <u>Wickline</u>, 239 Cal. Rptr. at 819 (decision of doctor to discharge patient after Medi-Cal (state utilization review body) would not authorize additional hospital stay, not decision of Medi-Cal on appropriate length of stay, is act upon which liability should be premised); Note, <u>supra</u>, 25 Ga. L. Rev. at 902-05 (discussing problem of proving that utilization review organization's decision is proximate cause of injury); <u>but</u> <u>see</u> <u>Wilson</u>, 271 Cal. Rptr. at 883 (finding that plaintiffs had adduced enough evidence as to causal effect of utilization review company's decision on decedent's suicide to avoid summary judgment).

14

cause of action brought against United because <u>Green</u> involved an actual physical examination by a doctor hired by an employer, not the detached decision of a utilization review company. Despite the lack of clear Louisiana authority supporting the Corcorans' theory of recovery against United, we can resolve the pre-emption question presented in this appeal. The law in this area is only beginning to develop, and it does not appear to us that Louisiana law clearly forecloses the possibility of recovery against United. Thus, assuming that on these facts the Corcorans might be capable of stating a cause of action for malpractice,[9] our task now is to determine whether such a cause of action is pre-empted by ERISA.

B. <u>Principles of ERISA Pre-emption</u>

The central inquiry in determining whether a federal statute pre-empts state law is the intent of Congress. <u>FMC Corp. v. Holliday</u>, 111 S. Ct. 403, 407 (1990); <u>Allis-Chalmers Corp. v. Lueck</u>, 471 U.S. 202, 208 (1985). In performing this analysis we begin with any statutory language that expresses an intent to pre-empt, but we look also to the purpose and structure of the statute as a whole. <u>FMC Corp.</u>, 111 S. Ct. at 407; <u>Ingersoll-Rand Co. v. McClendon</u>, 111 S. Ct. 478, 482 (1990).

ERISA contains an explicit pre-emption clause, which provides, in relevant part:

---

[9] If the Corcorans could sue United on a negligence theory, it would appear that they could recover damages incurred in connection with the death of their unborn child. <u>Danos</u>, 402 So. 2d at 637.

15

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a). . . .

ERISA § 514(a).[10]  It is by now well-established that the "deliberately expansive" language of this clause, <u>Pilot Life Insurance Co. v. Dedeaux</u>, 481 U.S. 42, 46 (1987), is a signal that it is be construed extremely broadly.  See <u>FMC Corp.</u>, 111 S. Ct. at 407 ("[t]he pre-emption clause is conspicuous for its breadth"); <u>Ingersoll-Rand</u>, 111 S. Ct. at 482.[11]  The key words

---

[10]  Statutory, decisional and all other forms of state law are included within the scope of the preemption clause.  ERISA § 514(c)(1) ("The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State").  Section 514(b)(2)(A) exempts certain state laws from pre-emption, but none of these exemptions is applicable here.

[11]  The legislative history indicates that Congress intended the preemption provision to be applied expansively.  In <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85 (1983), the Court explained:

> The bill that became ERISA originally contained a limited pre-emption clause, applicable only to state laws relating to the specific subjects covered by ERISA.  The Conference Committee rejected those provisions in favor of the present language, and indicated that section's pre-emptive scope was as broad as its language.  See H.R. Conf. Rep. No. 93-1280, p. 383 (1974); S. Conf. Rep. No. 93-1090, p. 383 (1974).

463 U.S. at 98.  Senator Williams, one of ERISA's sponsors, remarked:

> It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans.  This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law.

"relate to" are used in such a way as to expand pre-emption beyond state laws that relate to the specific subjects covered by ERISA, such as reporting, disclosure and fiduciary obligations. Id. at 482. Thus, state laws "relate[] to" employee benefit plans in a much broader sense -- whenever they have "a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983). This sweeping pre-emption of state law is consistent with Congress's decision to create a comprehensive, uniform federal scheme for the regulation of employee benefit plans. See Ingersoll-Rand, 111 S. Ct. at 482; Pilot Life, 481 U.S. at 45-46.

The most obvious class of pre-empted state laws are those that are specifically designed to affect ERISA-governed employee benefit plans. See Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 829-30 (1988) (statute explicitly barring garnishment of ERISA plan funds is pre-empted); Ingersoll-Rand, 111 S. Ct. at 483 (cause of action allowing recovery from employer when discharge is premised upon attempt to avoid contributing to pension plan is pre-empted). But a law is not saved from pre-emption merely because it does not target employee benefit plans. Indeed, much pre-emption litigation involves laws of general application which, when applied in particular settings, can be said to have a connection with or a reference to an ERISA plan. See Pilot Life, 481 U.S. at 47-48 (common law

_____

120 Cong. Rec. 29933 (1974). See also Pilot Life, 481 U.S. at 46.

17

tort and contract causes of action seeking damages for improper processing of a claim for benefits under a disability plan are pre-empted); Shaw, 463 U.S. at 95-100 (statute interpreted by state court as prohibiting plans from discriminating on the basis of pregnancy is pre-empted); Christopher v. Mobil Oil Corp., 950 F.2d 1209, 1218 (5th Cir. 1992) (common law fraud and negligent misrepresentation claims that allege reliance on agreements or representations about the coverage of a plan are pre-empted), petition for cert. filed 60 U.S.L.W. 3829 (U.S. May 26, 1992) (No. 91-1881); Lee v. E.I. DuPont de Nemours & Co., 894 F.2d 755, 758 (5th Cir. 1990) (same). On the other hand, the Court has recognized that not every conceivable cause of action that may be brought against an ERISA-covered plan is pre-empted. "Some state actions may affect employee benefit plans in too tenuous, remote or peripheral a manner to warrant a finding that the law 'relates to' the plan." Shaw, 463 U.S. at 100 n.21. Thus, "run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan" are not pre-empted, Mackey, 486 U.S. at 833 (discussing these types of claims in dicta).

C. Pre-emption of the Corcorans' Claims

Initially, we observe that the common law causes of action advanced by the Corcorans are not that species of law "specifically designed" to affect ERISA plans, for the liability rules they seek to invoke neither make explicit reference to nor are premised on the existence of an ERISA plan. Compare

18

Ingersoll-Rand, 111 S. Ct. at 483. Rather, applied in this case against a defendant that provides benefit-related services to an ERISA plan, the generally applicable negligence-based causes of action may have an effect on an ERISA-governed plan. In our view, the pre-emption question devolves into an assessment of the significance of these effects.

### 1. United's position -- it makes benefit determinations, not medical decisions

United's argument in favor of pre-emption is grounded in the notion that the decision it made concerning Mrs. Corcoran was not primarily a medical decision, but instead was a decision made in its capacity as a plan fiduciary about what benefits were authorized under the Plan. All it did, it argues, was determine whether Mrs. Corcoran qualified for the benefits provided by the plan by applying previously established eligibility criteria. The argument's coup de grace is that under well-established precedent,[12] participants may not sue in tort to redress injuries flowing from decisions about what benefits are to be paid under a plan. One commentator has endorsed this view of lawsuits against providers of utilization review services, arguing that, because medical services are the "benefits" provided by a utilization review company, complaints about the quality of medical services (i.e., lawsuits for negligence) "can therefore be characterized as claims founded upon a constructive denial of plan benefits."

---

[12] Pilot Life, 481 U.S. at 47-48.

19

Chittenden, <u>Malpractice Liability and Managed Health Care:</u> <u>History & Prognosis</u>, 26 Tort & Ins. Law J. 451, 489 (1991).

In support of its argument, United points to its explanatory booklet and its language stating that the company advises the patient's doctor "what the medical plan will pay for, based on a review of [the patient's] clinical information and nationally accepted medical guidelines for the treatment of [the patient's] condition."  It also relies on statements to the effect that the ultimate medical decisions are up to the beneficiary's doctor. It acknowledges at various points that its decision about what benefits would be paid was based on a consideration of medical information, but the thrust of the argument is that it was simply performing commonplace administrative duties akin to claims handling.

Because it was merely performing claims handling functions when it rejected Dr. Collins's request to approve Mrs. Corcoran's hospitalization, United contends, the principles of <u>Pilot Life</u> and its progeny squarely foreclose this lawsuit.  In <u>Pilot Life</u>, a beneficiary sought damages under various state-law tort and contract theories from the insurance company that determined eligibility for the employer's long term disability benefit plan. The company had paid benefits for two years, but there followed a period during which the company terminated and reinstated the beneficiary several times.  481 U.S. at 43.  The Court made clear, however, that ERISA pre-empts state-law tort and contract actions in which a beneficiary seeks to recover damages for

improper processing of a claim for benefits.  Id. at 48-49.

United suggests that its actions here were analogous to those of

the insurance company in Pilot Life, and therefore urges us to

apply that decision.

### 2. The Corcorans' position -- United makes medical decisions, not benefit determinations

The Corcorans assert that Pilot Life and its progeny are

inapposite because they are not advancing a claim for improper

processing of benefits.  Rather, they say, they seek to recover

solely for United's erroneous medical decision that Mrs. Corcoran

did not require hospitalization during the last month of her

pregnancy.  This argument, of course, depends on viewing United's

action in this case as a medical decision, and not merely an

administrative determination about benefit entitlements.

Accordingly, the Corcorans, pointing to the statements United

makes in the QCP booklet concerning its medical expertise,

contend that United exercised medical judgment which is outside

the purview of ERISA pre-emption.

The Corcorans suggest that a medical negligence claim is

permitted under the analytical framework we have developed for

assessing pre-emption claims.  Relying on Sommers Drug Stores Co.

Employee Profit Sharing Trust v. Corrigan Enterprises, Inc., 793

F.2d 1456 (5th Cir. 1986), cert. denied, 479 U.S. 1034 (1987),

they contend that we should not find the state law under which

they proceed pre-empted because it (1) involves the exercise of

traditional state authority and (2) is a law of general

application which, although it affects relations between

21

principal ERISA entities in this case, is not designed to affect the ERISA relationship.[13]

### 3. Our view -- United makes medical decisions incident to benefit determinations

We cannot fully agree with either United or the Corcorans. Ultimately, we conclude that United makes medical decisions -- indeed, United gives medical advice -- but it does so in the context of making a determination about the availability of benefits under the plan. Accordingly, we hold that the Louisiana tort action asserted by the Corcorans for the wrongful death of their child allegedly resulting from United's erroneous medical decision is pre-empted by ERISA.

Turning first to the question of the characterization of United's actions, we note that the QCP booklet and the SPD lend substantial support to the Corcorans' argument that United makes

---

[13] Amicus curiae Louisiana Trial Lawyers Association (LTLA) argues that United is not an ERISA fiduciary, and that therefore the tort claims against it cannot be pre-empted. The parties, however, agree that United is a fiduciary, and we have no reason to dispute this. United's contract with Bell would appear to give it "discretionary authority or discretionary control respecting management of [the] plan" or "authority or control respecting management or disposition of its assets. . . [,]" thus satisfying the statutory definition of a fiduciary. 29 U.S.C. § 1002(21)(A)(i). In any event, all courts of appeals to have considered the issue have held that ERISA pre-emption may apply regardless of whether the defendant is a plan fiduciary. Consolidated Beef Indus., Inc. v. New York Life Ins. Co., 949 F.2d 960, 964 (8th Cir. 1991); Gibson v. Prudential Ins. Co., 915 F.2d 414, 417-18 (9th Cir. 1990); Howard v. Parisian, Inc., 807 F.2d 1560, 1564 (11th Cir. 1987). Despite the suggestion in Howard that this circuit so held in Light v. Blue Cross and Blue Shield of Alabama, 790 F.2d 1247 (5th Cir. 1986), there is no indication that the defendant in Light was not a fiduciary, and even if it was not, no part of the opinion considers the precise question whether ERISA pre-empts suits against nonfiduciaries.

22

medical decisions.  United's own booklet tells beneficiaries that it "assess[es] the need for surgery or hospitalization and . . . determine[s] the appropriate length of stay for a hospitalization, based on nationally accepted medical guidelines."  United "will discuss with your doctor the appropriateness of the treatments recommended and the availability of alternative types of treatments."  Further, "United's staff includes doctors, nurses, and other medical professionals knowledgeable about the health care delivery system.  Together with your doctor, they work to assure that you and your covered family members receive the most appropriate medical care."  According to the SPD, United will "provid[e] you with information which will permit you (in consultation with your doctor) to evaluate alternatives to surgery and hospitalization when those alternatives are medically appropriate."

United makes much of the disclaimer that decisions about medical care are up to the beneficiary and his or her doctor.  While that may be so, and while the disclaimer may support the conclusion that the relationship between United and the beneficiary is not that of doctor-patient, it does not mean that United does not make medical decisions or dispense medical advice.  See Wickline, 239 Cal. Rptr. at 819 (declining to hold Medi-Cal liable but recognizing that it made a medical judgment); Macaulay, Health Care Cost Containment and Medical Malpractice: On a Collision Course, 19 Suffolk U.L. Rev. 91, 106-107 (1986) ("As illustrated in [Wickline], an adverse prospective

23

determination on the 'necessity' of medical treatment may involve complex medical judgment.") (footnote omitted).  In response, United argues that any such medical determination or advice is made or given in the context of administering the benefits available under the Bell plan.  Supporting United's position is the contract between United and Bell, which provides that "[United] shall contact the Participant's physician and based upon the medical evidence and normative data determine whether the Participant should be eligible to receive full plan benefits for the recommended hospitalization and the duration of benefits."

United argues that the decision it makes in this, the prospective context, is no different than the decision an insurer makes in the traditional retrospective context.  The question in each case is "what the medical plan will pay for, based on a review of [the beneficiary's] clinical information and nationally accepted medical guidelines for the treatment of [the beneficiary's] condition."  See QCP Booklet at 4.  A prospective decision is, however, different in its impact on the beneficiary than a retrospective decision.  In both systems, the beneficiary theoretically knows in advance what treatments the plan will pay for because coverage is spelled out in the plan documents.  But in the retrospective system, a beneficiary who embarks on the course of treatment recommended by his or her physician has only a potential risk of disallowance of all or a part of the cost of that treatment, and then only after treatment has been rendered.

24

In contrast, in a prospective system a beneficiary may be squarely presented in advance of treatment with a statement that the insurer will not pay for the proposed course of treatment recommended by his or her doctor and the beneficiary has the potential of recovering the cost of that treatment only if he or she can prevail in a challenge to the insurer's decision. A beneficiary in the latter system would likely be far less inclined to undertake the course of treatment that the insurer has at least preliminarily rejected.

By its very nature, a system of prospective decisionmaking influences the beneficiary's choice among treatment options to a far greater degree than does the theoretical risk of disallowance of a claim facing a beneficiary in a retrospective system. Indeed, the perception among insurers that prospective determinations result in lower health care costs is premised on the likelihood that a beneficiary faced with the knowledge of specifically what the plan will and will not pay for will choose the treatment option recommended by the plan in order to avoid risking total or partial disallowance of benefits. When United makes a decision pursuant QCP, it is making a medical recommendation which -- because of the financial ramifications -- is more likely to be followed.[14]

---

[14] It is the medical decisionmaking aspect of the utilization review process that has spawned the literature assessing the application of malpractice and other negligence-based doctrines to hold these entities liable for patient injuries. See Blum, supra, at 199 ("The overriding incentive for [utilization review] may be cost containment, but the process itself is triggered by a medical evaluation of a particular case,

Although we disagree with United's position that no part of its actions involves medical decisions, we cannot agree with the Corcorans that no part of United's actions involves benefit determinations. In our view, United makes medical decisions as part and parcel of its mandate to decide what benefits are available under the Bell plan. As the QCP Booklet concisely puts it, United decides "what the medical plan will pay for." When United's actions are viewed from this perspective, it becomes apparent that the Corcorans are attempting to recover for a tort allegedly committed in the course of handling a benefit determination. The nature of the benefit determination is different than the type of decision that was at issue in Pilot Life, but it is a benefit determination nonetheless. The principle of Pilot Life that ERISA pre-empts state-law claims alleging improper handling of benefit claims is broad enough to cover the cause of action asserted here.

Moreover, allowing the Corcorans' suit to go forward would contravene Congress's goals of "ensur[ing] that plans and plan sponsors would be subject to a uniform body of benefit law" and "minimiz[ing] the administrative and financial burdens of complying with conflicting directives among States or between States and the Federal Government." Ingersoll-Rand Co., 111 S.

an evaluation that requires a clinical judgment.") (footnote omitted); Tiano, supra, at 80 ("The patient faces conflicting judgments by two medical professionals: the treating physician and the utilization review consultant"); Chittenden, supra, at 476 ("negligent implementation of cost-control mechanisms may affect the medical judgment of the physician or other provider resulting in physical injury to the patient").

26

Ct. at 484; see also Fort Halifax Packing, 482 U.S. at 9-10. Thus, statutes that subject plans to inconsistent regulatory schemes in different states, thereby increasing inefficiency and potentially causing the plan to respond by reducing benefit levels, are consistently held pre-empted. See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 524 (1981) (striking down law which prohibited plans from offsetting benefits by amount of worker compensation payments); Shaw, 463 U.S. at 105 n.25 (striking down law which prohibited plans from discriminating on basis of pregnancy); FMC Corp., 111 S. Ct. at 408 (striking down law which eliminated plans' right of subrogation from claimant's tort recovery). But in Ingersoll-Rand, the Court, in holding pre-empted the Texas common law of wrongful discharge when applied against an employer who allegedly discharged an employee to avoid contributing to the employee's pension plan, made clear that a state common law cause of action is equally capable of leading to the kind of patchwork scheme of regulation Congress sought to avoid:

> It is foreseeable that state courts, exercising their common law powers, might develop different substantive standards applicable to the same employer conduct, requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction. Such an outcome is fundamentally at odds with the goal of uniformity that congress sought to implement.

111 S. Ct. at 484. Similarly, although imposing liability on United might have the salutary effect of deterring poor quality

27

medical decisions,[15] there is a significant risk that state liability rules would be applied differently to the conduct of utilization review companies in different states.  The cost of complying with varying substantive standards would increase the cost of providing utilization review services, thereby increasing the cost to health benefit plans of including cost containment features such as the Quality Care Program (or causing them to eliminate this sort of cost containment program altogether) and ultimately decreasing the pool of plan funds available to reimburse participants.  See Macaulay, supra, at 105.[16]

_____

[15]  See Comment, A Cost Containment Malpractice Defense: Implications for the Standard of Care and for Indigent Patients, 26 Hous. L. Rev. 1007, 1021 (1989) (by Leslie C. Giordani).

[16]  We find Independence HMO, Inc. v. Smith, 733 F. Supp. 983 (E.D. Pa. 1990), cited by the Corcorans, distinguishable on its facts.  In Smith, the district court did not find pre-empted a state court malpractice action brought against an HMO by one of its members.  The plaintiff sought to hold the HMO liable, under a state-law agency theory, for the alleged negligence of a surgeon associated with the HMO.  The case appears to support the Corcorans because the plaintiff was attempting to hold an ERISA entity liable for medical decisions.  However, the medical decisions at issue do not appear to have been made in connection with a cost containment feature of the plan or any other aspect of the plan which implicated the management of plan assets, but were instead made by a doctor in the course of treatment.

We also find Eurine v. Wyatt Cafeterias, No. 3-91-0408-H (N.D. Tex. Aug. 21, 1991), cited in the Corcorans' reply brief, irrelevant to this case.  In Eurine, an employee of Wyatt Cafeterias sued after she slipped and fell at work.  Wyatt had opted out of Texas's workers' compensation scheme, but provided benefits for injured employees pursuant to an ERISA plan.  The court held that a tort suit against the employer for its negligence in failing to maintain the floor in a safe condition had nothing to do with the ERISA relationship between the parties, but instead arose from their distinct employer-employee relationship.

Finally, to the extent that two other decisions cited by the

28

It may be true, as the Corcorans assert, that Louisiana tort law places duties on persons who make medical judgments within the state, and the Louisiana courts may one day recognize that this duty extends to the medical decisions made by utilization review companies. But it is equally true that Congress may pre-empt state-law causes of action which seek to enforce various duties when it determines that such actions would interfere with a carefully constructed scheme of federal regulation. See Pilot Life, 481 U.S. at 48. The acknowledged absence of a remedy under ERISA's civil enforcement scheme for medical malpractice committed in connection with a plan benefit determination does not alter our conclusion. While we are not unmindful of the fact that our interpretation of the pre-emption clause leaves a gap in remedies within a statute intended to protect participants in employee benefit plans, see Shaw, 463 U.S. at 90; Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989), the lack of an ERISA remedy does not affect a pre-emption analysis. Memorial Hosp., 904 F.2d at 248 & n.16; Lee, 894 F.2d at 757. Congress perhaps could not have predicted the interjection into the ERISA "system" of the medical utilization review process, but it enacted a pre-emption clause so broad and a statute so comprehensive that it would be incompatible with the language,

_____

Corcorans, Kohn v. Delaware Valley HMO, Inc., No. 91-2745 (E.D. Pa. Dec. 20, 1991 and Feb. 5, 1992), and Cooney v. South Central Bell Tel. Co., No. 91-3870 (E.D. La. March 5, 1992), conflict with our holding, we decline to follow them.

structure and purpose of the statute to allow tort suits against entities so integrally connected with a plan.

We are not persuaded that Sommers Drug, on which the Corcorans rely heavily, commands a different outcome. In Sommers Drug, we observed that courts are less likely to find pre-emption when the state law involves an exercise of traditional state authority than when the law affects an area not traditionally regulated by the states. Id. at 1467. The Corcorans contend that they easily pass this hurdle, as tort law traditionally has been reserved to the states, but this victory only puts them back at the starting line again. We went on to say in Sommers Drug that we were "not convinced" that the traditional or nontraditional nature of the state law properly bears upon the initial question whether it is pre-empted by § 514(a), because the distinction had no support in the statutory language. Id. at 1468. We continue to adhere to this view. As cases such as Ingersoll-Rand and Christopher illustrate, the fact that states traditionally have regulated in a particular area has functioned as no impediment to ERISA pre-emption. See Ingersoll-Rand, 111 S. Ct. at 483 (wrongful discharge action pre-empted); Christopher, 950 F.2d at 1218 (fraud action pre-empted). ERISA's pre-emption section itself contains an explicit exemption for state laws that regulate in at least one area of traditional state function -- insurance. ERISA § 514(b)(2)(A). There is no reason to believe that Congress intended implicitly to exempt a

30

whole range of state laws when it showed itself perfectly capable of carving out specific exemptions.

The second factor identified in <u>Sommers Drug</u> as bearing on pre-emption -- whether the state law affects relations among principal ERISA entities -- continues to be relevant in this circuit, <u>see</u> <u>Memorial Hospital Systems v. Northbrook Life Insurance Co.</u>, 904 F.2d 236, 245, 248-50 (5th Cir. 1990), but it does not help the Corcorans. In the case before us, of course, the cause of action affects relations between principal ERISA entities. Nevertheless, the Corcorans argue, <u>Sommers Drug</u> holds that the claim will not be pre-empted where the state law is one of general application and it does not affect relations among the principal ERISA entities "as such," but in their capacities as entities in another kind of relationship. They analogize to <u>Sommers Drug</u>, where we held that a pension plan, acting in its "non-ERISA" capacity as a shareholder in a company, could invoke the state common law of corporate fiduciary duty against an officer and director of the company and a plan fiduciary to redress an alleged breach of fiduciary duty. 793 F.2d at 1468-70. The short answer to this argument is that the cause of action in this case is not between parties acting in the kind of non-ERISA context we found in <u>Sommers Drug</u>. Although the claims in <u>Sommers Drug</u> nominally affected relations between ERISA entities, the lawsuit had nothing to do with the plan. Here, however, the central purpose of the lawsuit is to hold United liable for actions it took in connection with its duties under

31

the plan.  <u>Sommers Drug</u> does not mitigate the pre-emptive force of ERISA § 514(a).

## IV.  <u>EXTRACONTRACTUAL DAMAGES</u>

The Corcorans argue in the alternative that the damages they seek are available as "other appropriate equitable relief" under ERISA § 502(a)(3).  That section provides:

(a) A civil action may be brought --

.  .  .

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;
> .  .  .

Although the Corcorans did not assert a cause of action under § 502(a)(3) in their original state court complaint, they asked the district court in their motion for reconsideration to award damages pursuant to this section.  The defendants agreed at oral argument that the issue was properly raised and preserved for appeal, and we proceed to consider it.

Section 502(a)(3) provides for relief apart from an award of benefits due under the terms of a plan.  When a beneficiary simply wants what was supposed to have been distributed under the plan, the appropriate remedy is § 502(a)(1)(B).  <u>See</u>, <u>e.g.</u>, <u>Cathey v. Dow Chemical Co. Medical Care Program</u>, 907 F.2d 554, 555 (5th Cir. 1990), <u>cert.</u> <u>denied</u>, 111 S. Ct. 964 (1991). Damages that would give a beneficiary more than he or she is

32

entitled to receive under the strict terms of the plan are typically termed "extracontractual." Section 502(a)(3) by its terms permits beneficiaries to obtain "other appropriate equitable relief" to redress (1) a violation of the substantive provisions of ERISA or (2) a violation of the terms of the plan. Although the Corcorans have neither identified which of these two types of violations they seek to redress nor directed us to the particular section of the Plan or ERISA which they claim was violated, we need not determine this in order to resolve the issue before us. As outlined below, we find that the particular damages the Corcorans seek -- money for emotional injuries -- would not be an available form of damages under the trust and contract law principles which, the Corcorans urge, should guide our interpretation of ERISA's remedial scheme. Thus, we hold that even under the interpretation of § 502(a)(3) urged by the Corcorans, they may not recover.

The question whether extracontractual or punitive damages are available to a beneficiary under § 502(a)(3) has been left open by the Supreme Court ever since Massachusetts Mutual Life Insurance Co. v. Russell, 473 U.S. 134 (1985). In Russell, the beneficiary of a plan sought compensatory and punitive damages under ERISA §§ 502(a)(2) and 409(a)[17] for the improper processing of her claim for disability benefits. Id. at 136, 138. The Court rejected the argument that such damages were available

_____

[17] Section 502(a)(2) permits "the Secretary. . .a participant, beneficiary or fiduciary" to sue for appropriate relief under § 409.

33

under § 409(a), holding that § 409(a)(1) authorized only actions on behalf of the plan as a whole, not individual beneficiaries, for losses to the plan; and (2) provided no implied cause of action for extracontractual damages caused by improper claims processing. Russell, 473 U.S. at 140, 147. Because the beneficiary expressly disclaimed reliance on § 502(a)(3), however, the Court had no occasion to consider whether the damages the plaintiff sought were available under that section. Id. at 139 n.5.

In a concurrence joined by three other Justices, Justice Brennan emphasized that he read the Court's reasoning to apply only to § 409(a), and that the legislative history of ERISA suggested that courts should develop a federal common law in fashioning "other appropriate equitable relief" under § 502(a)(3). Id. at 155-56 (Brennan, J., concurring in the judgment). Justice Brennan argued that Congress "intended to engraft trust-law principles onto the enforcement scheme" of ERISA, including the principle that courts should give to beneficiaries of a trust the remedies necessary for the protection of their interests. Id. at 156-57. Consequently, he encouraged courts faced with claims for extracontractual damages first to determine to what extent state and federal trust and pension law provide for the recovery of damages beyond any benefits that have been withheld, and second to consider whether extracontractual relief would conflict with ERISA in any way. Id. at 157-58. With respect to the first inquiry he indicated

34

that any deficiency in trust law in the availability of make-whole remedies should not deter courts from authorizing such remedies under § 502(a)(3), for Congress intended in ERISA to strengthen the requirements of the common law of trusts as they relate to employee benefit plans. Id. at 157 n.17. Finally, Justice Brennan suggested, courts should keep in mind that the purpose of ERISA is the "enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." Id. at 158.

The Corcorans urge us to apply Justice Brennan's concurrence and hold that the damages they seek amount to "other appropriate equitable relief." The defendants, on the other hand, urge us to interpret "other appropriate equitable relief" to include only declaratory and injunctive relief. Under the defendants' view of § 502(a)(3), which has been adopted by a number of circuits,[18] no money damages would be awardable and our discussion would be at an end. However, even assuming that Justice Brennan's view of "other appropriate equitable relief" as potentially encompassing make-whole relief is a proper construction of that section, the damages the Corcorans seek would not be available.

------

[18] Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821 (1st Cir.), cert. denied, 488 U.S. 909 (1988); Harsch v. Eisenberg, 956 F.2d 651 (7th Cir. 1992), petition for cert. filed, 60 U.S.L.W. 3816 (U.S. May 11, 1992) (No. 91-1835); Novak v. Andersen Corp., No. 91-1957 (8th Cir. April 9, 1992); Sokol v. Bernstein, 803 F.2d 532 (9th Cir. 1986); Bishop v. Osborn Transp., Inc., 838 F.2d 1173 (11th Cir.), cert. denied, 488 U.S. 832 (1988).

35

The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation.  See Firestone, 489 U.S. at 110-11 (because ERISA is largely based on trust law, those principles guide interpretation); H.R. Rep. No. 533, 93d Cong., 1st Sess. (1973), reprinted in 1974 U.S. Code Cong. & Admin. News 4639; S. Rep. No. 127, 93d Cong., 1st Sess., reprinted in 1974 U.S. Code Cong. & Admin. News 4838 (indicating intent to incorporate the law of trusts into ERISA).  Section 205 of the Restatement (Second) of Trusts allows for monetary damages as make-whole relief, providing that a beneficiary has "the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust" or "of pursuing a remedy which will put him in the position in which he would have been if the trustee had not committed the breach of trust."  In the context of the breach of a trustee's investment duties, "the general rule [is] that the object of damages is to make the injured party whole, that is, to put him in the same condition in which he would have been if the wrong had not been committed. . . . Both direct and consequential damages may be awarded."  G. Bogert & G. Bogert, The Law of Trusts and Trustees § 701, at 198 (2d ed. 1982).  See also Estate of Talbot, 141 Cal. App. 309, 296 P.2d 848 (1956); In re Cook's Will, 136 N.J. Eq. 123, 40 A.2d 805 (1945).

36

This view may also be consistent with the common law contract doctrine which assists us in interpreting ERISA. As the Court observed in Russell, ERISA was enacted "to protect contractually defined benefits." 473 U.S. at 148. Prior to the enactment of ERISA, the rights and obligations of pension beneficiaries and trustees were governed not only by trust principles, but in large part by contract law. Firestone, 489 U.S. at 112-13; see also Rochester Corp. v. Rochester, 450 F.2d 118, 120-21 (4th Cir. 1971); Audio Fidelity Corp. v. Pension Benefit Guaranty Corp., 624 F.2d 513, 517 (4th Cir. 1980); Hoefel v. Atlas Tack Corp., 581 F.2d 1, 4-7 (1st Cir. 1978). It is well-established that contract law enables an aggrieved party to recover such damages as would place him in the position he would have occupied had the contract been performed, Restatement (Second) of Contracts § 347 & comment a (1981), including those damages that could reasonably have been foreseen to flow from the breach. Id. § 351; see Warren v. Society Nat. Bank, 905 F.2d 975, 980 (6th Cir. 1990) (§ 502(a)(3) allows for recovery of beneficiaries' increased tax liability after plan administrators failed to follow instructions regarding distribution), cert. denied, 111 S. Ct. 2556 (1991).

However, the Corcorans seek a form of extracontractual damages that is never, as far as we can tell, awarded for breach of trust duties, and is granted only in the most limited of circumstances for a breach of contract. Certainly, patients and their physicians can enter into contracts and physicians may

37

incur liability for breach.  The cases are uniform, however, in holding that there can be no recovery against a physician on a contractual theory, as opposed to the usual recovery on a tort theory of medical negligence, unless there is an express agreement to perform a particular service or to achieve a specific cure.  E.g., Bobrick v. Bravstein, 497 N.Y.S.2d 749, 751, 116 A.D.2d 682 (App. Div. 1986); Cirafici v. Goffen, 85 Ill. App. 3d 1102, 407 N.E.2d 633, 635, 41 Ill. Dec. 135 (1980); Depenbrok v. Kaiser Foundation Health Plan, Inc., 79 Cal. App. 3d 167, 144 Cal. Rptr. 724, 726 (1978).  In a few cases, courts, recognizing a distinction between commercial contracts and contracts for the performance of personal services, have found inapplicable the general rule that emotional distress damages are not available in contract actions[19] and have allowed damages for emotional injuries within the contemplation of the parties. Stewart v. Rudner, 349 Mich. 459, 84 N.W.2d 816, 824 (1957) ("the parties may reasonably be said to have contracted with reference to the payment of [emotional distress] damages therefor in event of breach"); Sullivan v. O'Connor, 363 Mass. 579, 296 N.E.2d 183, 188-89 (1973) (although mental anguish damages are not available for breach of a commercial contract, psychological injury may be contemplated in a contract for an operation) (citing Stewart). The Stewart rule, however, has not been widely adopted, and the

---

[19]  See J. Calamari & J. Perillo, The Law of Contracts §§ 14-3, 14-5(b), at 595-96 (3d ed. 1987); 11 W. Jaeger, Williston on Contracts § 1341, at 214 (3d ed. 1968); 5 Corbin on Contracts § 1076, at 426 (2d ed. 1964).

38

Michigan courts recently have characterized its holding concerning damages as applying only to contracts involving deep, personal relationships, Chrum v. Charles Heating & Cooling, Inc., 121 Mich. App. 17, 327 N.W.2d 568, 570 (1982), and contracts to perform very specific acts. Penner v. Seaway Hosp., 169 Mich. App. 502, 427 N.W.2d 584, 587 (1988).

The strictness with which courts have viewed doctor-patient contracts thwarts the Corcorans' claim that emotional distress damages would be available here under a make-whole interpretation of § 502(a)(3). The existence of a true doctor-patient relationship between Mrs. Corcoran and United which could support a contractual theory of recovery is dubious at best. Related to this problem is the lack of an express agreement for a particular service or for a particular result that serves as a prerequisite to a contract-based recovery. Even assuming that United's booklet could be considered an aspect of the "plan," breach of which would give rise to a cause of action under § 502(a)(3), it cannot be construed as making an agreement to perform any particular medical procedure or to arrive at any result. At most it makes promises to act in accordance with accepted standards of medical care. But courts have not recognized these sorts of promises as creating contractual duties between physicians and patients. Cirafici, 407 N.E.2d at 635-36 (failure to perform with requisite skill and care leads to action for negligence, not breach of contract); Awkerman v. Tri-County Orthopedic Group, P.C., 143 Mich. App. 722, 373 N.W.2d 204, 206 (1985) (physician's

39

breach of express or implied promise to act in accordance with standard of care not actionable in contract).  Indeed, the Massachusetts Supreme Judicial Court has emphasized that in an action seeking damages under Sullivan, one of the leading cases allowing mental distress damages for a breached medical contract, recovery is not for the doctor's failure to live up to the standard of care but solely for a failure to perform the specific promise contained in the agreement.  Salem Orthopedic Surgeons, Inc. v. Quinn, 377 Mass. 514, 386 N.E.2d 1268, 1271 (1979).  See also Murray v. University of Pennsylvania Hosp., 490 A.2d 839, 841 (Pa. Super. 1985) (action for breach of contract to achieve particular result may lie even if doctor has exercised highest degree of skill and care).

The fact that courts regularly view doctors and their patients as standing in a fiduciary relationship, e.g., Black v. Littlejohn, 312 N.C. 626, 325 S.E.2d 469, 482 (1985); Liebergesell v. Evans, 93 Wash. 2d 881, 613 P.2d 1170, 1176 (1980); State ex rel. Stufflebaum v. Appelquist, 694 S.W.2d 882, 885 (Mo. App. 1985), also is of no avail.  Although a plan beneficiary certainly may sue under § 502(a)(3) for a breach of the fiduciary duties set forth in § 404, the lack of a true doctor-patient relationship between Mrs. Corcoran and United undermines this ground of recovery.  In any event, courts have not held that patients may sue their doctors under any independent "breach of fiduciary duty" theory.  The remedies are limited to contract actions (where an express agreement has been

40

made) and, in the vast majority of cases, tort actions for negligence. Assuming without deciding, therefore, that § 502(a)(3) permits the award of make-whole relief as "other appropriate equitable relief," we hold that the emotional distress and mental anguish damages sought here by the Corcorans are not recoverable.

* * *

The result ERISA compels us to reach means that the Corcorans have no remedy, state or federal, for what may have been a serious mistake. This is troubling for several reasons. First, it eliminates an important check on the thousands of medical decisions routinely made in the burgeoning utilization review system. With liability rules generally inapplicable, there is theoretically less deterrence of substandard medical decisionmaking. Moreover, if the cost of compliance with a standard of care (reflected either in the cost of prevention or the cost of paying judgments) need not be factored into utilization review companies' cost of doing business, bad medical judgments will end up being cost-free to the plans that rely on these companies to contain medical costs.[20] ERISA plans, in

---

[20] We note that, were the Corcorans able to recover against United under state law, the contract between Bell and United indicates that United would bear the cost. However, the general application of a liability system to utilization review companies would ultimately result in increased costs to plans such as the Bell plan as it became more expensive for companies such as United to do business.

41

turn, will have one less incentive to seek out the companies that can deliver both high quality services and reasonable prices.

Second, in any plan benefit determination, there is always some tension between the interest of the beneficiary in obtaining quality medical care and the interest of the plan in preserving the pool of funds available to compensate all beneficiaries. In a prospective review context, with its greatly increased ability to deter the beneficiary (correctly or not) from embarking on a course of treatment recommended by the beneficiary's physician, the tension between interest of the beneficiary and that of the plan is exacerbated. A system which would compensate the beneficiary who changes course based upon a wrong call for the costs of that call might ease the tension between the conflicting interests of the beneficiary and the plan.

Finally, cost containment features such as the one at issue in this case did not exist when Congress passed ERISA. While we are confident that the result we have reached is faithful to Congress's intent neither to allow state-law causes of action that relate to employee benefit plans nor to provide beneficiaries in the Corcorans' position with a remedy under ERISA, the world of employee benefit plans has hardly remained static since 1974. Fundamental changes such as the widespread institution of utilization review would seem to warrant a reevaluation of ERISA so that it can continue to serve its noble purpose of safeguarding the interests of employees. Our system, of course, allocates this task to Congress, not the courts, and

42

we acknowledge our role today by interpreting ERISA in a manner consistent with the expressed intentions of its creators.

## V. <u>CONCLUSION</u>

For all the foregoing reasons, we find that ERISA pre-empts the Corcorans' tort claim against United and that the Corcorans may not recover damages for emotional distress under § 502(a)(3) of ERISA.  Accordingly, the judgment of the district court is AFFIRMED.