

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-1995

# Dukes v US Healthcare

Precedential or Non-Precedential:

Docket 94-1373

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Dukes v US Healthcare" (1995). *1995 Decisions*. Paper 169.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/169

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 94-1373


CECILIA DUKES, Trustee Ad Litem of the Estate of
Darryl Dukes, Deceased,
Appellant

v.

U.S. HEALTHCARE, INC.; GERMANTOWN HOSPITAL & MEDICAL CENTER;
WILLIAM W. BANKS, M.D.; CHARLES R. DREW MENTAL HEALTH CENTER;
EDWARD B. HOSTEN, M.D.



On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 93-cv-00577)



NO. 94-1661


SERENA MARY VISCONTI, DECEASED, BY LINDA AND RONALD VISCONTI,
AS ADMINISTRATORS OF THE ESTATE OF SERENA MARY VISCONTI,
DECEASED; LINDA VISCONTI; RONALD VISCONTI, IN THEIR OWN RIGHT,
Appellants

v.

U.S. HEALTH CARE, a/k/a
THE HEALTH MAINTENANCE ORGANIZATION OF PENNSYLVANIA/NJ



On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 93-cv-06495)


Argued December 5, 1994

BEFORE:  STAPLETON, ROTH and LEWIS, Circuit Judges

(Opinion Filed  June 19, l995  )

Attarah B. Feenane (Argued)
Stephen C. Josel
Stephen C. Josel & Associates, P.C.
2019 Walnut Street
Philadelphia, PA 19103
  Attorneys for Appellant
  in No. 94-1373

Edward S. Wardell (Argued)
Jeffrey S. Craig
Kelley, Wardell & Craig
41 Grove Street
Haddonfield, NJ 08033
  and
David F. Simon
U.S. Healthcare, Inc.
P.O. Box 1180
980 Jolly Road
Blue Bell, PA 19422
  Attorneys for Appellee
  U.S. Healthcare, Inc.
  in Nos. 94-1373 & 94-1661

Thomas S. Williamson, Jr.
Solicitor of Labor
Marc I. Machiz
Assistant Solicitor
Plan Benefits Security Division
Karen L. Handorf
Counsel for Special Litigation
G. William Scott (Argued)
Trial Attorney
U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
  Attorneys for Amicus Curiae
  U.S. Secretary of Labor
  in Nos. 94-1373 & 94-1661

Jeremy D. Mishkin
Richard M. Simins
Montgomery, McCracken, Walker & Rhoads
Three Parkway - 20th Floor

Philadelphia, PA 19102
  Attorneys for Amicus Curiae
  New Jersey HMO Association
  in No. 94-1661

OPINION OF THE COURT

STAPLETON, Circuit Judge:

The plaintiffs in these two cases filed suit in state court against health maintenance organizations ("HMOs") organized by U.S. Healthcare, Inc., claiming damages, under various theories, for injuries arising from the medical malpractice of HMO-affiliated hospitals and medical personnel. The defendant HMOs removed both cases to federal court, arguing (1) that the injured person in each case had obtained medical care as a benefit from a welfare-benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001-1461 (1988), (2) that removal is proper under the Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58 (1987), "complete preemption" exception to the "well-pleaded complaint rule," and (3) that the plaintiffs' claims are preempted by § 514(a) of ERISA, 29 U.S.C. § 1144(a). The district courts agreed with these contentions and dismissed the plaintiffs' claims against the HMOs. The plaintiffs appeal those rulings and ask that their claims against the HMOs be remanded to state court.

We hold that on the record before us, the plaintiffs' claims are not claims "to recover [plan] benefits due . . . under the terms of [the] plan, to enforce . . . rights under the terms

of the plan, or to clarify . . . rights to future benefits under the terms of the plan" as those phrases are used in § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Accordingly, we hold that Metropolitan Life's "complete preemption" exception is inapplicable and that removal of these claims from state court was improper. We will reverse the judgments of the district courts and will remand each case to district court with instructions to remand the cases to the state courts from which they were removed.

## I.

### A.

Suffering from various ailments, Darryl Dukes visited his primary care physician, defendant Dr. William W. Banks, M.D., who identified a problem with Darryl's ears. A few days later, Banks performed surgery and prepared a prescription ordering that blood studies be performed. Darryl presented that prescription to the laboratory of Germantown Hospital and Medical Center but the hospital refused to perform the tests. The record does not reveal the reasons for the hospital's refusal.

The next day, Darryl sought treatment from defendant Dr. Edward B. Hosten, M.D. at the Charles R. Drew Mental Health Center, who also ordered a blood test. This time, the test was performed. Darryl's condition nevertheless continued to worsen and he died shortly thereafter. Darryl's blood sugar level was extremely high at the time of his death. That condition

allegedly would have or could have been diagnosed through a timely blood test.

Darryl received his medical treatment through the United States Health Care Systems of Pennsylvania, Inc., a federally qualified health maintenance organization organized by U.S. Healthcare. As a qualified HMO under the federal Health Maintenance Organization Act of 1973, 42 U.S.C. §§ 300e–300e–17 (1988), this U.S. Healthcare HMO provides basic and supplemental health services to its members on a pre-paid basis.[1] As is often the case, Darryl received his membership in the HMO through his participation in an ERISA-covered welfare plan sponsored by his employer.

Darryl's wife, Cecilia Dukes, brought suit in state court alleging medical malpractice and other negligence against numerous defendants, including Banks, Hosten, the Germantown Hospital, and the Drew Center. She also brought suit against the HMO, alleging that as the organization through which Darryl received his medical treatment, it was responsible, under a

_____

[1]. HMOs often contain costs through a strategy known as "utilization review." See generally John D. Blum, An Analysis of Legal Liability in Health Care Utilization Review and Case Management, 26 Hous. L. Rev. 191, 192–93 (1989); Susan J. Stayn, Note, Securing Access to Care in Health Maintenance Organizations: Toward a Uniform Model of Grievance and Appeal Procedures, 94 Colum. L. Rev. 1674, 1677–83 (1994). Unlike traditional insurance policies, HMOs usually decide whether to reimburse patients for medical care prospectively -- through utilization or "pre-certification" review. The HMO may either perform the utilization review itself or assign the task to a third-party contractor. Id. at 1681; see also Corcoran v. United Healthcare, Inc., 965 F.2d 1321, 1323 (5th Cir.), cert. denied, 113 S. Ct. 812 (1992).

Pennsylvania state law ostensible agency theory (the "agency theory"), for the negligence of the various doctors and other medical-service providers. See Boyd v. Albert Einstein Medical Ctr., 547 A.2d 1229, 1234-35 (Pa. Super. Ct. 1988) (holding that an HMO may be held liable for malpractice under an ostensible agency theory where a patient looks to the HMO for care and the HMO's conduct leads the patient to reasonably believe that he or she is being treated by an employee of the HMO). She alleged further that the HMO failed to exercise reasonable care in selecting, retaining, screening, monitoring, and evaluating the personnel who actually provided the medical services (the "direct negligence theory").

The HMO removed the case to district court pursuant to the Metropolitan Life complete-preemption exception to the "well-pleaded complaint rule." In its notice of removal, it claimed that the HMO is part of -- or at least plays a role in -- the ERISA plan to provide health benefits and that Dukes' claims, properly construed, "are directed to the structure and operation of the employer benefit plan." (Dukes app. at 31.) In its view, Dukes' claims therefore "relate to" the welfare plan and accordingly are preempted under ERISA § 514(a), 29 U.S.C. § 1144(a).

Dukes moved for a remand and the HMO moved to dismiss. The district court denied Dukes' motion and granted the HMO's, explaining that Dukes' claims "related to" an ERISA plan -- and thus were preempted -- because (1) "any ostensible agency claim must be made on the basis of what the benefit plan provides and

is therefore 'related' to it" and (2) "the treatment received must be measured against the benefit plan and is therefore also 'related' to it." Dukes v. United States Health Care Sys., Inc., 848 F. Supp. 39, 42 (E.D. Pa. 1994). It remanded to state court the remainder of Dukes' claims against the other defendants. Id. at 43.

B.

Ronald and Linda Visconti are the biological parents of Serena Visconti, who was stillborn. During the third trimester of her pregnancy with Serena, Linda apparently developed symptoms typical of preeclampsia. The Viscontis claim that Linda's obstetrician, Dr. Wisniewski, negligently ignored these symptoms and that this negligence caused Serena's death.

Like Darryl Dukes, Linda received her medical treatment through a federally qualified HMO organized by U.S. Healthcare. This HMO was called the Health Maintenance Organization of Pennsylvania/New Jersey. The Viscontis received their membership in the HMO through an ERISA-covered welfare plan.

Ronald Visconti, as administrator of Serena's estate, and Ronald and Linda, in their own right (collectively, "the Viscontis"), brought suit in the Philadelphia County Court of Common Pleas. They attempted to hold the HMO liable for Dr. Wisniewski's malpractice under ostensible and actual agency theories, alleging that when Linda became pregnant, the HMO held out Dr. Wisniewski as a competent and qualified participating obstetrician/gynecologist. They also sued the HMO under a direct

negligence theory, claiming, among other things, that the HMO was negligent in its selection, employment, and oversight of the medical personnel who performed the actual medical treatment.

The HMO removed the case to federal court, asserting that the Viscontis' claims were completely preempted by ERISA. It then filed a motion to dismiss, and the Viscontis filed a motion to remand, contending that removal was improper and that ERISA did not preempt their state law claims. The district court denied the Viscontis' motion but granted the HMO's motion to dismiss. Visconti ex rel. Visconti v. U.S. Health Care, 857 F. Supp. 1097, 1105 (E.D. Pa. 1994).

The Visconti and Dukes cases have been consolidated on appeal.

II.

The HMOs removed these cases to federal court pursuant to 28 U.S.C. § 1441, alleging that the district courts had original jurisdiction over the claims, because the claims "[arose] under the Constitution, treaties or laws of the United States." § 1441(b); 28 U.S.C. § 1331. To determine whether a claim "arises under" federal law -- and thus is removable -- we begin with the "well-pleaded complaint rule." See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987); see also Allstate Ins. Co. v. 65 Security Plan, 879 F.2d 90, 92-93 (3d Cir. 1989).

Under the well-pleaded complaint rule, a cause of action "arises under" federal law, and removal is proper, only if

a federal question is presented on the face of the plaintiff's properly pleaded complaint. Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 9-12 (1983). A federal defense to a plaintiff's state law cause of action ordinarily does not appear on the face of the well-pleaded complaint, and, therefore, usually is insufficient to warrant removal to federal court. Gully v. First Nat'l Bank, 299 U.S. 109, 115-18 (1936). Thus, it is well-established that the defense of preemption ordinarily is insufficient justification to permit removal to federal court. Caterpillar, Inc. v. Williams, 482 U.S. 386, 398 (1987) ("The fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted under [a federal statute] does not establish that they are removable to federal court.").

The Supreme Court has recognized an exception to the well-pleaded complaint rule -- the "complete preemption" exception -- under which "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." Metropolitan Life, 481 U.S. at 63-64; see generally Goepel v. National Postal Mail Handlers Union, 36 F.3d 306, 309-13 (3d Cir. 1994) (discussing the Court's complete-preemption jurisprudence and holding that the Federal Employees Health Benefits Act did not completely preempt plaintiffs' state law claims), cert. denied, 131 L. Ed. 2d. 555 (1995); Allstate, 879 F.2d at 93-94 (holding that the complete-preemption exception did not apply in a situation where an insurance company plaintiff sought contribution from an ERISA plan because § 502 of ERISA does not

provide an express cause of action vindicating the interest that the suit sought to protect and enforce); Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R. Co., 858 F.2d 936, 939-43 (3d Cir. 1988) (discussing the Court's complete-preemption doctrine and holding that neither the Railway Labor Act nor the Interstate Commerce Act completely preempted plaintiffs' state law fraudulent conveyance claims against railroads and railroad officials). The complete preemption doctrine applies when

> the pre-emptive force of [the federal statutory provision] is so powerful as to displace entirely any state cause of action [addressed by the federal statute]. Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of [the federal provision].

Franchise Tax Bd., 463 U.S. at 23. Claims to enforce a collective-bargaining agreement under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, present a typical example of the complete-preemption doctrine at work: In Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557 (1968), the Court ruled that any claims to enforce a collective-bargaining agreement -- even when phrased as a state law cause of action to enforce a contract -- are removable to federal court.

The Supreme Court has determined that Congress intended the complete-preemption doctrine to apply to state law causes of action which fit within the scope of ERISA's civil-enforcement provisions.[2] Metropolitan Life, 481 U.S. at 66. It explained:

_____

[2]. ERISA's "six carefully integrated civil enforcement provisions" are found in § 502. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 146 (1985). The statutory provision

> [T]he legislative history consistently sets out [Congress's] clear intention to make § 502(a)(1)(B) suits brought by participants or beneficiaries federal questions for the purposes of federal court jurisdiction in like manner as § 301 of [the Labor Management Relations Act of 1947, 29 U.S.C. § 185.] For example, Senator Williams, a sponsor of ERISA, emphasized that the civil enforcement section would enable participants and beneficiaries to bring suit to recover benefits denied contrary to the terms of the plan and that when they did so "[i]t is intended that such actions will be regarded as arising under the laws of the United States, in a similar fashion to those brought under section 301 of the Labor Management Relations Act."

481 U.S. at 66 (citations omitted). Thus, courts have found that the Metropolitan Life complete-preemption doctrine permits removal of state law causes of action in a host of different ERISA-related circumstances. See id. at 63-67 (holding that state common law causes of action asserting improper processing of a claim for benefits under an employee benefit plan are

(..continued)
relevant for the purposes of this appeal, § 502(a)(1)(B), states in pertinent part:

> **(a) Persons empowered to bring a civil action**
>
> A civil action may be brought --
>
> (1) by a participant or beneficiary --
>
> . . . .
>
> > (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

removable to federal court); Anderson v. Electronic Data Sys. Corp., 11 F.3d 1311, 1314 (5th Cir.) (holding that removal was proper because state law claim alleging that plan fiduciary was demoted and terminated for refusing to violate ERISA fell within § 502(a)(2) & (3)), cert. denied, 115 S. Ct. 55 (1994); Sofo v. Pan-American Life Ins. Co., 13 F.3d 239, 240-41 (7th Cir. 1994) (plaintiff's state court rescission claim against a group insurance policy for the policy's refusal to reimburse plaintiff for medical treatment received was properly removed because plaintiff's claim was for a denial of benefits); Smith v. Dunham-Bush, Inc., 959 F.2d 6, 8-12 (2d Cir. 1992) (common law claim for breach of an oral promise to pay pension-related benefits properly removed to federal court); Lister v. Stark, 890 F.2d 941, 943-44 (7th Cir. 1989) (plaintiff's state law claim challenging the calculation of his time of "uninterrupted service" for the purposes of calculating his pension benefits held removable), cert. denied, 498 U.S. 1011 (1990).

That the Supreme Court has recognized a limited exception to the well-pleaded complaint rule for state law claims which fit within the scope of § 502 by no means implies that all claims preempted by ERISA are subject to removal. Instead, as the U. S. Court of Appeals for the Sixth Circuit wrote recently, "[r]emoval and preemption are two distinct concepts." Warner v. Ford Motor Co., 46 F.3d 531, 535 (6th Cir. 1995). Section 514 of ERISA defines the scope of ERISA preemption, providing that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in

[§ 4(a) of ERISA] and not exempt under [§ 4(b) of ERISA]." (Emphasis added.)  The Metropolitan Life complete-preemption exception, on the other hand, is concerned with a more limited set of state laws, those which fall within the scope of ERISA's civil enforcement provision, § 502.  State law claims which fall outside of the scope of § 502, even if preempted by § 514(a), are still governed by the well-pleaded complaint rule and, therefore, are not removable under the complete-preemption principles established in Metropolitan Life.  See Franchise Tax Bd., 463 U.S. at 23-27 (holding that preemption under § 514(a) does not permit a defendant to remove a suit brought in state court to federal court when the plaintiff's state claim does not fall within the scope of ERISA's civil remedy provisions); Metropolitan Life, 481 U.S. at 64 (stating that ERISA preemption under § 514(a) "without more, does not convert [a] state claim into an action arising under federal law"); see also Allstate, 879 F.2d at 93-94 (holding that § 514(a) preemption defense will not justify removal unless claim falls within the scope of ERISA's civil enforcement provision, § 502); Warner, 46 F.3d at 535 (that a claim is preempted under § 514(a) does not necessarily establish that the claim is removable); Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 272-73 (2d Cir. 1994) (state law professional malpractice claim against company hired by plaintiff's employer to provide psychotherapy services deemed outside the scope of § 502(a)(1)(B) and therefore not removable).

The difference between preemption and complete preemption is important.  When the doctrine of complete

preemption does not apply, but the plaintiff's state claim is arguably preempted under § 514(a), the district court, being without removal jurisdiction, cannot resolve the dispute regarding preemption. It lacks power to do anything other than remand to the state court where the preemption issue can be addressed and resolved. Franchise Tax Bd., 463 U.S. at 4, 27-28; Allstate, 879 F.2d at 94; Warner, 46 F.3d at 533-35; Lupo, 28 F.3d at 274.

## III.

The district courts in these cases found that the plaintiffs' state law claims against the U.S. Healthcare HMOs fall within the scope of § 502(a)(1)(B) and that the Metropolitan Life complete-preemption doctrine therefore permits removal.[3] We disagree.

To determine whether the state law claims fall within the scope of § 502(a)(1)(B), we must determine whether those claims, properly construed, are "to recover benefits due . . . under the terms of [the] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." In making that determination, it would be helpful to have a complete understanding in each case of the relationships among the HMO, the employer, and the other

---

[3]. There is no contention that the plaintiffs' state law claims implicate any of ERISA's civil enforcement provisions other than those set out in § 502(a)(1)(B). Accordingly, we direct our discussion to whether the plaintiffs' claims fall within the scope of § 502(a)(1)(B).

defendants, the nature of the plan benefits, and the rights of participants and beneficiaries under the plan.  We are somewhat hampered here because these cases come to us on appeal from orders granting motions to dismiss.  Because of this procedural status, the parties have had little chance to develop the records and, accordingly, we know very little about the nature of the plan benefits or about the role -- if any -- that U.S. Healthcare's HMOs play in the respective ERISA welfare plans.

We recognize that there are issues in dispute.  The plaintiffs and the Department of Labor as amicus curie, for example, claim that the U.S. Healthcare HMOs are separate from the ERISA plans and that the sole benefit that participants and beneficiaries receive from each plan is the plaintiffs' membership in the HMOs.  In their view, the plaintiffs' claims thus have nothing at all to do with § 502(a)(1)(B) because no one contests that the plaintiffs in fact have received their plan benefits (their membership in the HMO).  Instead, under their view, the plaintiffs' claims merely attack the behavior of an entity completely external to the ERISA plan.

U.S. Healthcare, on the other hand, claims that the plan benefits are more than just the plan participants' or beneficiaries' memberships in the respective HMOs; it argues that the medical care received is itself the plan benefit.  As a corollary to that position, it also disagrees with the plaintiffs' view that the HMOs are completely distinct from the respective ERISA plans, arguing that the HMOs in fact play a role in the delivery of plan benefits.  It further maintains that

ERISA is implicated because both the plaintiffs' agency claims and their direct negligence claims relate to the quality of the plan benefits and the HMOs' role as the entity that arranges for those benefits for the ERISA plans.

We need not here resolve these disputes about how to characterize the plan benefits or the HMOs' role in the respective ERISA plans.  We will assume, without deciding, that the medical care provided (and not merely the plaintiffs' memberships in the respective HMOs) is the plan benefit for the purposes of ERISA.  We will also assume that the HMOs, either as a part of or on behalf of the ERISA plans, arrange for the delivery of those plan benefits.  We thus assume, for example, that removal jurisdiction would exist if the plaintiffs were alleging that the HMOs refused to provide the services to which membership entitled them.

Given those assumptions, we nevertheless conclude that removal was improper.  We are compelled to this conclusion because the plaintiffs' claims, even when construed as U.S. Healthcare suggests, merely attack the <u>quality</u> of the benefits they received:  The plaintiffs here simply do not claim that the plans erroneously withheld benefits due.  Nor do they ask the state courts to enforce their rights under the terms of their respective plans or to clarify their rights to future benefits. As a result, the plaintiffs' claims fall outside of the scope of § 502(a)(1)(B) and these cases must be remanded to the state courts from which they were removed.

A.

Nothing in the complaints indicates that the plaintiffs are complaining about their ERISA welfare plans' failure to provide benefits due under the plan. Dukes does not allege, for example, that the Germantown Hospital refused to perform blood studies on Darryl because the ERISA plan refused to pay for those studies. Similarly, the Viscontis do not contend that Serena's death was due to their welfare plan's refusal to pay for or otherwise provide for medical services. Instead of claiming that the welfare plans in any way withheld some quantum of plan benefits due, the plaintiffs in both cases complain about the low quality of the medical treatment that they actually received and argue that the U.S. Healthcare HMO should be held liable under agency and negligence principles.

We are confident that a claim about the quality of a benefit received is not a claim under § 502(a)(1)(B) to "recover benefits due . . . under the terms of [the] plan." To reach that conclusion, "we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., Nos. 93-1408, 93-1414, 93-1415, 1995 WL 238409, at *6 (April 26, 1995).

The text lends no support to U.S. Healthcare's argument. On its face, a suit "to recover benefits due . . . under the terms of [the] plan" is concerned exclusively with whether or not the benefits due under the plan were actually

provided. The statute simply says nothing about the quality of benefits received.

Nor does anything in the legislative history, structure, or purpose of ERISA suggest that Congress viewed § 502(a)(1)(B) as creating a remedy for a participant injured by medical malpractice. When Congress enacted ERISA it was concerned in large part with the various mechanisms and institutions involved in the funding and payment of plan benefits. That is, Congress was concerned "that owing to the inadequacy of current minimum [financial and administrative] standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered." § 2, 29 U.S.C. § 1001(a). Thus, Congress sought to assure that promised benefits would be available when plan participants had need of them and § 502 was intended to provide each individual participant with a remedy in the event that promises made by the plan were not kept. We find nothing in the legislative history suggesting that § 502 was intended as a part of a federal scheme to control the quality of the benefits received by plan participants. Quality control of benefits, such as the health care benefits provided here, is a field traditionally occupied by state regulation and we interpret the silence of Congress as reflecting an intent that it remain such. See, e.g., Travelers Ins. Co., 1995 WL 238409, at *7 (noting that while quality standards and work place regulations in the context of hospital services will indirectly affect the sorts of benefits an ERISA plan can afford, they have traditionally been left to the states,

and there is no indication in ERISA that Congress chose to displace general health care regulation by the states).

                              B.

          We also reject the HMOs' attempts to characterize the plaintiffs' state court complaints as attempts to enforce their "rights under the terms of the [respective welfare] plan[s]." That phrase is included, we believe, so as to provide a means of enforcing any contract rights other than the right to benefits, as for example the various plan-created rights of plan participants to benefit-claim and benefit-eligibility procedures. Just as § 502(a)(1)(B) provides the means by which a participant can insist on the promised benefits, so too does it provide the means for insisting on the plan-created rights other than plan benefits.[4]

_____

[4]. ERISA ordinarily requires that welfare plans set out a description of the rights of the participants and their beneficiaries in a summary plan description ("SPD"). 29 U.S.C. § 1022(b); see also 29 C.F.R. § 2520.102-2(a) (the plan description must "apprise the plan's participants and beneficiaries of their rights and obligations under the plan"); 29 C.F.R. § 2520.102-3(j)(2) (SPD for an ERISA welfare plan must include "a statement of the conditions pertaining to eligibility to receive benefits"); 29 C.F.R. § 250.102-3(l) (SPD must include "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits"); 29 C.F.R. § 102-3(s) (SPD must include a statement describing "[t]he procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of claims which are denied in whole or in part"). That requirement is relaxed in situations where the ERISA plan chooses to provide benefits through a qualified HMO. Under 29 C.F.R. § 2520.102-5(a), if health benefits are provided through an HMO, the SPD need not contain the usual description of the rights of participants or beneficiaries, provided the SPD contains a notice stating, among

The HMOs point to no plan-created right implicated by the plaintiffs' state law medical malpractice claims.  The best they can do is assert that the plaintiffs' medical malpractice claims "attempt to define a participant's rights under the plan." (Appellee's bf. in Visconti, at 9.)  We cannot accept that characterization.  The plaintiffs are not attempting to define new "rights under the terms of the plan"; instead, they are attempting to assert their already-existing rights under the generally-applicable state law of agency and tort.  Inherent in the phrases "rights under the terms of the plan" and "benefits due . . . under the terms of [the] plan" is the notion that the plan participants and beneficiaries will receive something to which they would not be otherwise entitled.  But patients enjoy the right to be free from medical malpractice regardless of

(..continued)
other things, that plan participants will receive membership "in one or more qualified health maintenance organizations," § 2520.102-5(b)(1), and that upon request each available HMO will provide certain written information, namely

> (i) the nature of services provided to
> members; (ii) conditions pertaining to
> eligibility to receive such services (other
> than general conditions pertaining to
> eligibility for participation in the plan)
> and circumstances under which services may be
> denied; and (iii) the procedures to be
> followed in obtaining such services, and the
> procedures available for the review of claims
> for services which are denied in whole or in
> part.

§ 2520.102-5(b)(3).

whether or not their medical care is provided through an ERISA plan.

## C.

Much of the above analysis also precludes us from concluding that the plaintiffs are asking the state courts to "clarify [their] rights to future benefits under the terms of the plan." As noted, there is no allegation here that the HMOs have withheld plan benefits due. Moreover, nothing in the complaints remotely resembles a request that the court clarify a right to a future benefit; instead, the plaintiffs' complaints center on past events.

## D.

We recognize that the distinction between the quantity of benefits due under a welfare plan and the quality of those benefits will not always be clear in situations like this where the benefit contracted for is health care services rather than money to pay for such services. There well may be cases in which the quality of a patient's medical care or the skills of the personnel provided to administer that care will be so low that the treatment received simply will not qualify as health care at all. In such a case, it well may be appropriate to conclude that the plan participant or beneficiary has been denied benefits due under the plan. This is not such a case, however. While the Dukes complaint alleges that the Germantown Hospital committed malpractice when it decided not to perform certain blood tests,

no one would conclude from that malpractice that Germantown Hospital was not acting as a health care provider when it made those decisions. Similarly, while the Viscontis claim that Dr. Wisniewski was incompetent, there is no indication that he was not performing health care services at the time he allegedly committed the malpractice charged.

We also recognize the possibility that an ERISA plan may describe a benefit in terms that can accurately be described as related to the quality of the service. Thus, for example, a plan might promise that all X-rays would be analyzed by radiologists with a prescribed level of advanced training. A plan participant whose X-ray was analyzed by a physician with less than the prescribed training might well be entitled to enforce the plan's promise through a suit under § 502(a)(1)(B) to secure a denied benefit.

Much of the HMOs' argument in these cases is at root a contention that the employer and the HMO impliedly contracted that the health care services provided would be of acceptable quality and, accordingly, that these damage suits rest on a failure to provide services of acceptable quality. Since we do not have before us the documents reflecting the agreements between the employers and the HMOs, we are not in a position to determine whether such a commitment was implicit in their respective agreements. However, the burden of establishing removal jurisdiction rests with the defendant. Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir. 1985); see generally 14A Charles A. Wright, et al., Federal Practice &

Procedure § 3721, at 209-10 (1985 & Supp. 1995).  Accordingly, the HMO is not in a position to press this argument.

Moreover, we hasten to add that while we have no doubt that all concerned expected the medical services arranged for by the HMOs to be of acceptable quality, this seems to us beside the point.  The relevant inquiry is not whether there was an expectation of acceptably competent services, but rather whether there was an agreement to displace the quality standard found in the otherwise applicable law with a contract standard.

It may well be that an employer and an HMO could agree that a quality of health care standard articulated in their contract would replace the standards that would otherwise be supplied by the applicable state law of tort.  We express no view on whether an ERISA plan sponsor may thus by contract opt out of state tort law and into a federal law of ERISA contract.  We will reserve that issue until a case arises presenting it.[5]  Nothing in this record suggests an agreement to displace the otherwise applicable state laws of agency and tort.

IV.

---

[5].  It would seem to Judge Roth that, if a plan were to adopt its own standard of acceptable health care to be made available to beneficiaries, the plan should provide concurrently, through insurance or otherwise, an appropriate remedy to beneficiaries for any failure of the plan care providers to meet that standard or, in the alternative, should inform plan beneficiaries that tort law remedies for medical malpratice would not be available to them under the plan.

The HMOs take heart in a recent case, Corcoran v. United Healthcare, Inc., 965 F.2d 1321 (5th Cir.), cert. denied, 113 S. Ct. 812 (1992), in which the U.S. Court of Appeals for the Fifth Circuit held that ERISA preempts a medical malpractice claim against a medical consulting company for decisions it made as the third-party administrator of a welfare plan's "pre-certification" review program.  We agree with the HMOs that under Corcoran, third-party private companies may, in some circumstances, play a role in an ERISA plan and that claims against such companies may fall within the scope of § 502(a).  We nevertheless find Corcoran inapposite on the facts and claims alleged in this case.

Corcoran began as a state law wrongful death action against Blue Cross and Blue Shield of Alabama ("Blue Cross") and United Heathcare ("United"), in which Florence Corcoran charged that the defendants were responsible for the death of her unborn fetus.  An employee at South Central Bell Telephone, Corcoran was a member of Bell's Medical Assistance Plan ("the Bell Plan"), a self-funded welfare-benefit plan which provides medical benefits to eligible Bell employees.  The Bell Plan was administered by Blue Cross.

One provision of the plan, the "Quality Care Program" ("QCP") required plan participants and beneficiaries to obtain advance approval for certain medical procedures and overnight hospital visits.  Such cost-containment programs typically are known as "utilization review" or "pre-certification review" programs.  Under the QCP, once a patient's doctor recommended

surgery or hospitalization, the staff assigned to the QCP was required to perform an independent review of the patient's condition to determine both the need for the surgery and the appropriate length of hospitalization.  As is often the case, the Bell Plan hired a third party -- United -- to perform the QCP for the Plan.  See generally Susan J. Stayn, Note, Securing Access to Care in Health Maintenance Organizations:  Toward a Uniform Model of Grievance and Appeal Procedures, 94 Colum. L. Rev. 1694, 1677-83 (1994).

Corcoran's doctor, in response to difficulties Corcoran was experiencing with her pregnancy, recommended that Corcoran be hospitalized.  As a result, Corcoran applied to the Bell Plan for disability benefits for the remainder of her pregnancy.  Despite the recommendation of Corcoran's doctor, United determined that hospitalization was unnecessary, and instead authorized only 10 hours a day of home nursing care.  The fetus went into distress and died during a period of time when the nurse assigned to Corcoran was not on duty.  Corcoran subsequently filed suit in Louisiana state court against Blue Cross and United.

United removed the case to federal district court, claiming that Corcoran's claims were completely preempted by ERISA.  The district court then granted United's motion to dismiss and Corcoran appealed.

The U.S. Court of Appeals for the Fifth Circuit ruled that ERISA preempted Corcoran's claim against United and -- implicitly, at least -- that Corcoran's claims were completely preempted.  It explained that while United was in fact giving

medical advice, it gave that advice as part of its role of making benefit determinations for the plan. 965 F.2d at 1331. Thus, the court determined that plaintiffs were "attempting to recover for a tort allegedly committed in the course of handling a benefit determination," id. at 1332, and that such state law claims are preempted by ERISA. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 48 (1987) (common law cause of action arising from "improper processing of a claim for benefits" preempted by ERISA); see also Kuhl v. Lincoln Nat'l Health Plan, Inc., 999 F.2d 298, 303 (8th Cir. 1993) (medical malpractice claim against plan administrator for delaying pre-certification of heart surgery arose from administration of benefits and therefore was preempted), cert. denied, 114 S. Ct. 694 (1994); Berger v. Edgewater Steel Co., 911 F.2d 911, 923 (3d Cir. 1990) (claim against plan sponsor for misrepresenting available benefits preempted), cert. denied, 499 U.S. 920 (1991).

The HMOs argue that we should read Corcoran broadly to hold that medical malpractice claims against an HMO should be removable under Metropolitan Life whenever an HMO provides the complained-about medical treatment as a benefit of an ERISA-covered health plan. They note that several district courts have adopted versions of their suggested approach. See, e.g., Ricci v. Gooberman, 840 F. Supp. 316, 317-18 (D.N.J. 1993) (plaintiff's attempt to hold an HMO liable under a vicarious liability claim similar to the ones at bar held preempted); Butler v. Wu, 853 F. Supp. 125, 129-30 (D.N.J. 1994) (same); Nealy v. U.S. Healthcare HMO, 844 F. Supp. 966, 973 (S.D.N.Y. 1994) (plaintiff's attempts

to hold an HMO liable under several common law theories held preempted); Altieri v. Cigna Dental Health, Inc., 753 F. Supp 61, 63-65 (D. Conn. 1990) (ERISA preempts plaintiff's negligent supervision claim against an HMO). But see Independence HMO, Inc. v. Smith, 733 F. Supp. 983, 987-89 (E.D. Pa. 1990) (ERISA does not preempt medical malpractice-type claims brought against HMOs under a vicarious liability theory); Elsesser v. Hospital of the Philadelphia College of Osteopathic Medicine, 802 F. Supp. 1286, 1290-91 (E.D. Pa. 1992) (same for a claim against an HMO for the HMO's negligence in selecting, retaining, and evaluating plaintiff's primary-care physician). See also Kearney v. U.S. Healthcare, Inc., 859 F. Supp. 182, 186-87 (E.D. Pa. 1994) (holding in a case similar to those at bar that ERISA preempts plaintiff's direct negligence claim, but not its vicarious liability claim).

The HMOs' reliance on Corcoran is misplaced. Although United's decisions in Corcoran were in part medical decisions, United, unlike the HMOs here, did not provide, arrange for, or supervise the doctors who provided the actual medical treatment for plan participants. (Blue Cross played that role in Corcoran.) Instead, United only performed an administrative function inherent in the "utilization review." The difference between the "utilization review" and the "arranging for medical treatment" roles is crucial for the purposes of § 502(a)(1)(B) because only in a utilization-review role is an entity in a

position to deny benefits due under an ERISA welfare plan.[6]  965 F.2d at 1333 n.16 (noting that ERISA is implicated in "utilization review" decisions but not medical-treatment decisions because only the former are "made in connection with a cost containment plan"); see also Kuhl, 999 F.2d at 301-03 (malpractice claims against insurance company hired to perform a "pre-certification review" held to fall within § 502(a)'s civil enforcement provisions); Elsesser, 802 F. Supp. at 1290-91 (holding that the cause of action based on allegations that HMO withheld benefits were preempted, while the claims against HMO for its negligent selection, retention, and evaluation of a primary-care physician were not preempted).

In these cases, the defendant HMOs play two roles, not just one.[7]  In addition to the utilization-review role played by United in Corcoran, the HMOs also arrange for the actual medical treatment for plan participants.  Only this second role is relevant for this appeal, however:  on the faces of these complaints there is no allegation that the HMOs somehow should be held liable for any decisions they might have made while acting

---

[6].  As noted in Part III, we are assuming, without deciding, that the medical care provided (and not merely the plaintiffs' memberships in the respective HMOs) is the plan benefit for the purposes of ERISA.  So viewed, when acting in their utilization-review role, the HMOs are making benefit determinations.

[7].  There is nothing unusual about this.  HMOs often arrange for the medical treatment and perform the utilization review (instead of hiring a third party).  See, e.g., Elsesser, 802 F. Supp. at 1290-91 (HMO playing both roles); see also Stayn, supra, at 1677.

in their utilization-review roles.[8]  Stated another way, unlike Corcoran, there is no allegation here that the HMOs denied anyone any benefits that they were due under the plan.  Instead, the plaintiffs here are attempting to hold the HMOs liable for their role as the arrangers of their decedents' medical treatment.

For this reason, these cases are more like Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269 (2d Cir. 1994).  There, an employer had contracted with a psychotherapy service group, Human Affairs International, Inc. ("HAI"), to provide mental health services to its employees in connection with an employee benefit plan governed by ERISA.  Lupo, an employee who received psychotherapy services from HAI, sued HAI in a state court for his therapist's professional malpractice, breach of fiduciary duty, and intentional infliction of emotional distress.  HAI, like the HMOs here, removed the case to federal court, claiming that ERISA completely preempted Lupo's claims.  The district court agreed with HAI, and, accordingly, dismissed Lupo's claim.  The U.S. Court of Appeals for the Second Circuit reversed, holding that the district court lacked removal jurisdiction and was thus obligated to remand to the state court.  It reached this conclusion because "[o]n their face, none of [Lupo's] claims [bore] any significant resemblance to those described in

_____

[8].  The only possible exception is Dukes' allegation that the Germantown Hospital refused to perform blood studies on Darryl.  Still, on the record before the court, there is no indication that the hospital refused to perform those studies because of the ERISA plan's refusal to pay.

[§ 502(a)(1)(B)]."  28 F.3d at 272.  The situation in the cases at bar is closely analogous.  As in Lupo, the plaintiffs' claims in these cases do not concern a denial of benefits due or a denial of some other plan-created right.  Thus, the claims here, like those in Lupo, bear no significant resemblance to the claims described in § 502(a)(1)(B).

V.

For the foregoing reasons, the district courts' judgments in these cases will be reversed and remanded with instructions to remand the cases to the state courts from which they came.  Our holding that the districts courts lack removal jurisdiction, of course, leaves open for resolution by the state courts the issue of whether the plaintiffs' claims are preempted under § 514(a).