Miller v. HealthAmerica Pennsylvania Inc.

2

C.P. of Allegheny County, no. GD99-910.

*Henry Lewis Miller*, for plaintiff.

*Deborah D. Olszewski*, for defendant HealthAmerica Pennsylvania Inc., Maxicare/HealthAmerica Pennsylvania Inc., HealthAmerica Corporation of Pennsylvania Inc. and Penn Group Health Plan Inc.

*Christopher Rulis*, for defendant Dillinger.

*William D. Phillips,* for defendant Lang.

*David R. Johnson*, for defendant Keystone Health Plan West Inc., Veritus Inc., Highmark Inc. and Medical Service Association of Pennsylvania Inc.

FOLINO, *J.,* December 12, 2000—This case calls for me to decide whether the Employee Retirement Income Security Act of 1974, 88 Stat. 832, *as amended*, 29 U.S.C. 1001 et seq., preempts some of plaintiff's state law medical malpractice claims.

## I.

Plaintiff, Janice Miller, has filed an amended complaint in civil action against HealthAmerica Pennsylvania Inc. and other defendants, alleging that defendants in various ways negligently caused plaintiff to suffer kidney failure and related conditions.

The amended complaint contains 26 counts and some 747 paragraphs. This opinion addresses preliminary objections that HealthAmerica has filed to four particular subparagraphs of one of those paragraphs: Count IV (en-

titled corporate negligence), paragraph 110, subparagraphs (f), (g), (j) and (1) which allege the following:

"(110) The negligence of the defendant [Health-America], which violated the standard of care that was due to the plaintiff, consisted of the following:

"(f) in formulating and adopting rules, regulations, policies or procedures that would discourage or limit the referral to a specialist of a patient in the plaintiff's circumstances;

"(g) in formulating and adopting rules, regulations, policies or procedures that would discourage or limit the ordering of laboratory tests in the plaintiff's circumstances; . . .

"(j) in imposing a patient workload on its primary care physicians that inhibited them from adequately monitoring their patients' histories of medication usage and laboratory test results; . . .

"(1) in formulating and adopting rules, regulations, policies or procedures that would encourage primary care physicians to optimize their financial gain by reducing or limiting the care provided to patients;" See Health-America's preliminary objections at paragraph 5.

I have sustained defendant's preliminary objections to subparagraphs (f), (g) and (1), and overruled as to (j).

## II.

It is uncontested that plaintiff was a subscriber to a health maintenance organization, HealthAmerica, through an employee benefit plan. In the preliminary objections before me, HealthAmerica argues that the claims made in the subparagraphs above are preempted by section 514(a) of ERISA, 29 U.S.C. §1144(a). Sec-

tion 514(a) states in relevant part that ERISA "shall supersede any and all state laws insofar as they . . . relate to an employee benefit plan." 29 U.S.C. §1144(a).

In determining the proper preemptive force to be given to section 514(a), the United States Supreme Court, in the 1980s and early 1990s, initially looked to the text of the provision itself. See *e.g., Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39, 49 (1987); *Shaw v. Delta Airlines Inc.,* 463 U.S. 85, 96, 103 S.Ct. 2890, 2899-2900, 77 L.Ed.2d 490, 501 (1983). The court stated that the words of the preemption provision were to be given their "broad common sense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728, 740 (1985). (citations omitted) Thus, ERISA's broad preemption language had been read to afford an expansive scope of ERISA preemption over state law.

Beginning with its decision in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), however, the court has sounded a cautionary tone and has suggested a different analytical approach. In *Travelers,* the court acknowledged that the statutory text itself was not helpful: "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for really, universally, relations stop nowhere." 514 U.S at 655. (citations omitted) The Supreme Court's focus has moved away from an attempt

to construe the broad language of the text itself and toward an examination of the objectives of the ERISA statute together with a determination whether the state law in question intrudes upon those objectives in a meaningful way: "We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." 514 U.S. at 656.

In *Travelers,* the court then reviewed the objectives Congress had in mind in enacting ERISA and its preemption provision:

"As we have said before, section 514 indicates Congress's intent to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern.' We have found that in passing section 514(a), Congress intended 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among states or between states and the federal government . . . , and to prevent the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.' . . .

"The basic thrust of the preemption clause, then, was to avoid a multiplicity of regulation in order to permit the *nationally uniform administration* of employee benefit plans." 514 U.S. at 657. (citations omitted) (emphasis added)

The court further noted that *"[t]he federal statute* does not go about protecting plan participants and their beneficiaries by requiring employers to provide any given

set of minimum benefits, but instead *controls the administration of benefit plans.*" 514 U.S. at 651. The *Travelers* court emphasized that "nothing in the language of the Act or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." 514 U.S. at 661. (citations omitted) Rather, "ERISA preempted state laws that mandated employee benefit structures or *their administration.*" 514 U.S. at 658. (emphasis added)

In the case before me, HealthAmerica does not argue that plaintiff's state law claims would mandate particular benefit structures. Rather, HealthAmerica contends that these malpractice claims, which attack the HMO's financial incentive to physicians to ration care (subparagraphs (f), (g) and (1)), and which attack the manner in which the HMO manages its physicians' workloads (subparagraph (j)), all "seek recovery for denial of plan benefits based upon HealthAmerica's *administration* of the . . . plan." HealthAmerica's supplemental preliminary objections addressing preemption at p. 3. (emphasis added)

Under these circumstances, "the court's task in ascertaining whether claims are preempted by ERISA is to examine the nature of the claims—and the state laws underlying them—with an eye to whether allowing those claims to go forward would have a significant impact upon the administration of an ERISA plan." *Lazorko v. Pennsylvania Hospital,* 1998 WL 405055 at 4.

Thus, it is important for me to determine what is meant by "administration" of an ERISA plan. I would then be in a position to determine whether the tort claims before

me in this case would have a significant impact upon such administration if allowed to go forward.

Both parties cite the Third Circuit cases of *Dukes v. U.S. Healthcare Inc.,* 57 F.3d 350 (1995), *cert. denied,* 516 U.S. 1009, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995) and *Bauman v. U.S. Healthcare Inc.,* 193 F.3d 151 (1999), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2687, 147 L.Ed.2d 960 (2000) in support of their respective positions. It first must be noted that these cases dealt with the issue of "complete preemption," not with the issue of "express preemption" that is before me. Although these legal concepts are different, as I shall develop in detail below, the analysis and discussion used by the Third Circuit in resolving its issue (complete preemption) are also relevant in the resolution of my issue.

"Complete preemption" is strictly a jurisdictional concept. It is used by a federal court to determine whether it has federal jurisdiction to hear a particular case that has been removed from state court. The issue arises in the following context:

"Under the 'well-pleaded complaint' rule, federal jurisdiction is lacking unless a federal question appears on the face of a properly pleaded complaint; a federal defense does not confer subject matter jurisdiction .... Hence, according to the usual operation of the well-pleaded complaint rule, federal jurisdiction would be lacking where, as here, the complaint is based entirely on state law." *Bauman,* 193 F.3d at 160. (citations omitted)

Thus, for our purposes, under normal application of the "well-pleaded complaint" rule, a state court medical malpractice claim against an HMO would not appear to

be removable to federal court, because such a complaint would not contain an explicit ERISA claim. No federal question—no ERISA claim—appears on the face of such a complaint.

An exception to the well-pleaded complaint rule exists where Congress has expressed an intent to "completely preempt" a particular area of law such that any claim that falls within that area is necessarily federal in character. Such claims may be removed to federal court notwithstanding the absence of a federal cause of action on the face of the complaint. As applies to ERISA, the United States Supreme Court has held that in enacting *the civil-enforcement provisions of section 502(a) of* ERISA, Congress intended to "completely" preempt state law. See *e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987). Thus, to determine *complete* preemption, one looks to the civil enforcement provisions of section *502(a)* of ERISA. Specifically, a court must consider whether the state law "falls within the scope of" the civil enforcement provisions of 502(a)(1)(B) which state that a participant or beneficiary may bring an ERISA action *"to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."* See *Bauman,* 193 F.3d at 161. If a state law claim comes within the scope of these civil enforcement provisions it is part of a completely preempted field of law and its removal to federal court is proper.

Express preemption, then, is a broader concept than complete preemption under section 502(a). All completely preempted claims are necessarily expressly preempted. A claim that is not completely preempted, however, may yet be expressly preempted.

10

In *Dukes v. U.S. Healthcare Inc.,* plaintiff's decedent, Daryl Dukes, belonged to an employee benefit plan administered by U.S. Healthcare (the HMO). Mr. Dukes allegedly died after, and as a result of, receiving medical attention for various complaints. Plaintiff brought a medical malpractice action in state court alleging, inter alia, that the HMO had failed to exercise reasonable care in selecting, retaining, screening, monitoring and evaluating the doctors and hospitals to which it directed Mr. Dukes for medical care.

The HMO removed the suit to the federal district court "contending that plaintiff's state claims were in fact ERISA claims subject to original jurisdiction [in federal court]." 848 F. Supp. at 40.

Plaintiff moved to remand the case back to state court. The district court denied plaintiff's motion, and by doing so implicitly found that under the complete preemption doctrine at least one of the medical malpractice claims was in fact a claim under the civil enforcement provisions (section 502) of ERISA. In other words, according to the district court, at least one of plaintiff's claims, was, in effect, when properly construed, a claim to recover benefits under the terms of the plan, to enforce rights under the terms of the plan, or to clarify rights to future benefits under the terms of the plan. Accordingly, there was *complete* preemption and therefore jurisdiction in federal court.

Having retained jurisdiction, the district court then addressed a motion to dismiss filed by the HMO. In this motion, the HMO argued that plaintiff's malpractice claims against the HMO all "relate to" an ERISA plan and are therefore preempted by the *express* preemption

provision of ERISA at section 514. Thus, the issue before the district court in the motion to dismiss is similar to the one facing me here: whether certain medical malpractice claims are preempted by the *express* preemption provision of ERISA, section 514. The district court held that the malpractice claims were so preempted.

Accordingly, the district court granted U.S. Healthcare's motion to dismiss, but did so *without prejudice*. Presumably, the malpractice claims were dismissed without prejudice because having implicitly determined that at least one of these claims was within the scope of ERISA's civil enforcement provisions (otherwise removal would not have been proper), the district court was now affording plaintiff the opportunity to re-cast her claims as federal ERISA claims.

On appeal, the Third Circuit held that the district court erred *in allowing removal* of the case to federal court. In other words, the Third Circuit *did not address* the issue of whether there was *express* preemption of the state claims. Rather, the court, determined that the doctrine of *complete* preemption did not apply to any of the medical malpractice state law claims against the HMO and therefore removal was not proper. The Third Circuit therefore remanded the claims to state court. The Third Circuit thus left it for the state court to determine whether the malpractice claims against the HMO are expressly preempted by ERISA.

The analysis performed by the Third Circuit in *Dukes,* although addressing the complete preemption issue, is nevertheless important for any court making an express preemption determination. In its analysis, the Third Circuit first noted that the civil enforcement provisions are

to be narrowly construed. For example, "a suit 'to recover benefits due . . . under the terms of the plan' is concerned exclusively with whether or not the benefits due under the plan were actually provided. The statute simply says nothing about the quality of benefits received." 57 F.3d at 357.

The Third Circuit emphasized that plaintiff's medical malpractice claim (that the HMO negligently selected and monitored doctors and hospitals) did not in any way involve, or attempt to enforce, a contract right under the ERISA plan:

"The HMOs point to no plan-created right implicated by the plaintiffs' state law medical malpractice claims. The best they can do is assert that the plaintiffs' medical malpractice claims 'attempt to define a participant's rights under the plan.' We cannot accept that characterization. The plaintiffs are not attempting to define new 'rights under the terms of the plan;' instead *they are attempting to assert their already-existing rights under the generally-applicable state law of agency and tort.* Inherent in the phrases 'rights under the terms of the plan' and 'benefits due . . . under the terms of the plan' is the notion that the plan participants and beneficiaries will receive something to which they would not be otherwise entitled. *But patients enjoy the right to be free from medical malpractice regardless of whether or not their medical care is provided through an ERISA plan.*" 57 F.3d at 358. (citations omitted) (emphasis added)

This analysis by the Third Circuit is important in several respects. By narrowly construing ERISA's civil enforcement provisions, the court thereby necessarily limits a plan beneficiary's ability to seek protection by way

of an ERISA action. Only certain very limited matters may be addressed through the civil enforcement provisions of ERISA. The only way a plan beneficiary may obtain judicial relief for any other medical claim is to bring a state court medical malpractice action.

Moreover, the Third Circuit seems to be suggesting that the medical malpractice claim made in *Dukes* (that the HMO negligently selected and monitored doctors and hospitals) is the type of claim that plaintiffs have the right to pursue outside of ERISA. It seems to me, therefore, that the Third Circuit's analysis should be read also to have some meaning in connection with an express preemption determination.

This is further suggested by other aspects of the Third Circuit's opinion in *Dukes*. For example, the Third Circuit concluded that the medical malpractice claims in *Dukes* were actually claims against the *quality* of the benefits provided, and therefore do not come within the scope of the civil enforcement provision of ERISA:

"We find nothing in the legislative history suggesting that section 502 [the civil enforcement provision] was intended as a part of a federal scheme to control the quality of the benefits received by plan participants. *Quality control of benefits, such as the health care benefits provided here, is a field traditionally occupied by state regulation and we interpret the silence of Congress as reflecting an intent that it remain such.* See *e.g., Travelers Insurance Co.,* 514 U.S. at 645, (noting that while quality standards and work place regulations in the context of hospital services will indirectly affect the sorts of benefits an ERISA plan can afford they have traditionally been left to the states, and there is no indication in ERISA

that Congress chose to displace general health care regulation by the states)." 57 F.3d at 357.

In perhaps the most significant section of the opinion, the Third Circuit went on to state that "HMOs play two roles, not just one" in connection with the medical treatment provided to a plan beneficiary. 57 F.3d at 361. On the one hand, the HMOs play an "administrative function," and on the other hand play "their role as the arranger of [the plan beneficiary's] medical treatment." 57 F.3d at 361. *When the HMO "provide[s], arrange[s] for, or supervise[s] the doctors who provided the actual medical treatment for plan participants" the HMO is acting in its capacity as the "arranger" of medical treatment, and is not performing its administrative function.* 57 F.3d at 360. (emphasis added)

Having determined that plaintiff's claim did not attack the HMO in its administrative capacity, the court concluded that plaintiff's claim likewise did not come within the scope of ERISA's civil enforcement provision (and therefore was not completely preempted).

This determination by the Third Circuit—that such actions by the HMO are not within the HMO's *administrative* function—is also very significant to any court addressing the issue of express preemption. As noted previously, it follows from the United States Supreme Court decision in *Travelers* that a court's task in determining whether particular state law tort claims are preempted by the express preemption provision of ERISA is to determine whether allowing those claims to go forward would have a significant impact on the *administration* of an ERISA plan. If, as the Third Circuit concluded in *Dukes,* claims against the manner in which an

HMO has *arranged for* a plan beneficiary's medical care do *not* attack the administration of a benefit plan, then, quite obviously, allowing such claims to go forward does not have any impact on the administration of the plan, let alone a significant impact.

Quite recently, in fact, in *Bauman v. U.S. Healthcare Inc.,* 193 F.3d 151 (3d Cir. 1999), the Third Circuit had the opportunity to revisit and expand upon, the concepts it developed in *Dukes.* In *Bauman,* a mother and father (the Baumans) brought a medical malpractice suit in state court for damages arising from the death of their newborn daughter. Plaintiffs alleged that the HMO was negligent in its selection and monitoring of the doctors who provided medical care, and in making certain medical treatment decisions itself.

The Third Circuit took the opportunity to reaffirm the distinction drawn in *Dukes* that an HMO may play two roles: (1) as an administrator of plan benefits, and (2) as a *provider* (or arranger) of health care. It is only when the HMO acts in the first capacity that ERISA is implicated. The Third Circuit stated the matter as follows:

*"As an administrator* overseeing an ERISA plan, *an HMO will have administrative responsibilities over the elements of the plan, including determining eligibility for benefits,* calculating those benefits, disbursing them to the participant, monitoring available funds, and keeping records. As we held in *Dukes,* claims that fall within the essence of the administrator's activities in this regard fall within section 502(a)(1)(B) and are completely preempted.

"In contrast, as noted by the secretary, when the HMO acts under the ERISA plan *as a health care provider, it*

*arranges and provides medical treatment,* directly or through contracts with hospitals, doctors or nurses. See *Dukes,* 57 F.3d at 361; see also, *Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321, 1329-34 (5th Cir. 1992) (recognizing that HMOs act as both health care provid-ers and plan administrators). *In performing these activi-ties, the HMO is not acting in its capacity as a plan ad-ministrator but as a provider of health care, subject to the prevailing state standard of care. "*

If, as the Third Circuit concluded, an HMO is *subject to* the prevailing state standard of care when it makes medical treatment decisions and otherwise acts as a pro-vider of health care to plan beneficiaries, then the HMO must be subject to state court medical malpractice claims for those actions. And, if the HMO is *subject to* state court malpractice claims for those actions, then it fol-lows that such claims are not in any way preempted by ERISA. Accordingly, even though *Bauman* is a com-plete preemption case, I read the above analysis to apply as well to express preemption determinations.

The Third Circuit's analysis (and my conclusion that it has application in express preemption determinations) is consistent with the recent decision of the Supreme Court of Pennsylvania in *Pappas v. Asbel,* 555 Pa. 342, 724 A.2d 889 (1998), *vacated for further consideration,* 530 U.S. 1241, 120 S.Ct. 2686, 147 L.Ed.2d 959 (2000). In *Pappas,* the underlying facts were as follows: Basile Pappas was admitted to Haverford Community Hospital through its emergency room complaining of paralysis and numbness. At the time of his admission, Mr. Pappas was a subscriber to a health maintenance organization (HMO) through an employee benefit plan sponsored by

his wife's employer. The Haverford emergency room physician concluded that Mr. Pappas's condition constituted a neurological emergency and made arrangements to transfer Mr. Pappas to a particular university hospital (Thomas Jefferson University Hospital). Although not a facility within the HMO network, Jefferson had a spinal cord trauma unit able to commit to Mr. Pappas's immediate admission.[1] Under Mr. Pappas's benefit plan, he was covered for treatment at HMO network facilities only, except for medical emergencies, when he was covered at any facility, even those outside the HMO network.

The emergency room physician called the HMO to request authorization, making it clear that the situation was a neurological emergency. The HMO, however, would not authorize treatment at Jefferson, but did authorize treatment at three other (HMO-network) university hospitals. The emergency room physician then initiated a series of phone calls to determine availability at one of the three approved hospitals and to arrange for Mr. Pappas's admission there. All of this resulted in further delays. Mr. Pappas now suffers from permanent quadriplegia resulting from the medical condition that brought him to the emergency room.

---

1. Most of the factual history of the *Pappas* case was derived from the opinion of the Supreme Court of Pennsylvania. However, in order to understand more fully the background of the case, I also reviewed the paper books submitted in connection with the petition for writ of certiorari filed with the Supreme Court of the United States. Because the posture of the case was a motion for summary judgment by the defendant HMO, all facts are considered in a light most favorable to plaintiff.

Mr. Pappas and his wife filed a state court medical malpractice action against the primary care physician (who saw plaintiff the day before these events) and Haverford Community Hospital. Plaintiffs claimed that Haverford was negligent in causing an inordinate delay in transferring Mr. Pappas to a facility properly equipped and immediately available to handle the neurological emergency. Haverford filed a third-party complaint against the HMO, joining it as a defendant for refusing to authorize Mr. Pappas's transfer to Jefferson. Haverford also incorporated (for purposes of the third-party complaint) the negligence claims made against Haverford in the original complaint. In this way, Haverford also claimed that the HMO was negligent in the dilatory manner in which it arranged for Mr. Pappas's transfer to a facility equipped to treat him.

At the close of discovery, the HMO filed a motion for summary judgment, arguing that the claim against it must be dismissed under the express preemption provision of ERISA. The case eventually worked its way to the Pennsylvania Supreme Court where the court held that these state court claims against the HMO were not preempted by ERISA.

The Pennsylvania Supreme Court used some broad language in its opinion: "we conclude that negligence claims against a health maintenance organization do not 'relate to' an ERISA plan." 555 Pa. at 351, 724 A.2d at 893. The specific holding of the case, however, was no broader than the Third Circuit analysis discussed above. The Pennsylvania Supreme Court did not analyze its case in the same manner as did the Third Circuit in *Bauman* and *Dukes*. Thus, the Pennsylvania Supreme Court did

not explicitly discuss the various roles that an HMO may play: sometimes an administrator of a benefit plan, sometimes a "provider" or "arranger" of medical care. Nevertheless, the court reached the same essential result: claims against an HMO regarding the *quality* of medical benefits the HMO provided to a plan beneficiary are not preempted. The Pennsylvania Supreme Court analyzed the issue as follows:

"Based upon our interpretation of the *Travelers* line of cases, we conclude that negligence claims against a health maintenance organization do not 'relate to' an ERISA plan. As noted by *Travelers,* Congress did not intend to preempt state laws which govern the provision of safe medical care. *Travelers,* 514 U.S. at 661, 115 S.Ct. at 1680, 131 L.Ed.2d at 709. Claims that an HMO was negligent when it provided contractually-guaranteed medical benefits in such a dilatory fashion that the patient was injured indisputably are intertwined with the provision of safe medicare care." 555 Pa. at 351, 724 A.2d at 893.

What was implicit in the majority's opinion in *Papas*—that the claims against U.S. Healthcare were not preempted because these claims attacked the HMO's medical determinations, not the HMO's administration of the plan—was made explicit in Justice Nigro's concurring opinion:

"Based upon the facts set forth in the majority opinion, I find that U.S. Healthcare's actions constituted, in effect, an individual medical decision or judgment as opposed to a decision affecting the administration of an employee benefit plan. Here, the parties are merely attempting to assert their already existing rights under the

generally applicable state law of agency and tort." 555 Pa. at 353, 724 A.2d at 894.

Our analysis does not end, however, with the holding of the Pennsylvania Supreme Court, as the HMO in that case filed a petition for writ of certiorari with the United States Supreme Court. The United States Supreme Court reviewed the various petition briefs submitted by the parties, and invited the solicitor general to submit an amicus petition brief expressing the views of the United States, and then entered the following order:

"Petition for writ of certiorari granted. Judgment vacated, and case remanded to the Supreme Court of Pennsylvania, Eastern District, for further consideration in light of *Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)." *United States Healthcare Systems of Pennsylvania Inc. v. Pennsylvania Hospital Insurance Co.* 120 S.Ct. at 2686-87.

So, the question becomes: what significance does *Pegram v. Herdrich* have toward the Pennsylvania Supreme Court's decision in *Pappas* (and toward the issues involved in the case before me). The answer requires some detailed analysis of *Pegram: Pegram* does not concern a claim of ERISA preemption, but rather a claim that the HMO breached a fiduciary duty. Therefore, its significance toward preemption issues cannot be discerned by a quick reading of the United States Supreme Court's holding in *Pegram.*

In *Pegram,* plaintiff (Cynthia Herdrich) was a covered beneficiary through an ERISA benefit plan sponsored by her husband's employer. As is customarily the case, the employer contracted with an HMO to provide specified medical coverage to plan participants such as plaintiff.

The events in question began when an HMO physician examined Ms. Herdrich who was experiencing pain in her midgroin. Six days later the same physician discovered an inflamed mass in Ms. Herdrich's abdomen. Despite this noticeable inflammation, the HMO physician did not order a diagnostic procedure at a local hospital, but decided that Ms. Herdrich would have to wait eight days for the procedure, when it could be performed at a facility staffed by the HMO. The HMO-affiliated facility was located more than 50 miles away. Before the eight days had passed, Ms. Herdrich's appendix burst, causing serious medical complications.

Ms. Herdrich sued the physician and the HMO for medical malpractice, but the claim under discussion before the United States Supreme Court was plaintiff's count for breach of fiduciary duty under ERISA. Here, Ms. Herdrich alleged that under the terms of the HMO, at the same time the participating HMO physicians were making medical treatment decisions, they were also being financially rewarded by the HMO for limiting medical care. Specifically, Ms. Herdrich alleged that under the terms of the HMO, the participating physicians had a financial incentive: to minimize the use of diagnostic tests; to minimize the use of facilities not owned by the HMO; and to minimize the use of emergency consultation by, and referrals to, non-HMO physicians.

The HMO moved to dismiss the ERISA count for failure to state a claim upon which relief could be granted. The United States Supreme Court held that "mixed eligibility decisions by HMO physicians are not fiduciary decisions under ERISA." 120 S.Ct. at 2158.

What then, is a "mixed eligibility decision," and what is the significance (as to ERISA preemption) that such is not a "fiduciary" decision? These questions are developed below. In arriving at its holding, the court analyzed a number of matters important for any court addressing ERISA preemption issues as they relate to the acts of an HMO. For example, the Supreme Court took up the matter of an HMO playing various roles: sometimes making medical treatment decisions and sometimes making administrative decisions. That discussion arose in the following context. Ms. Herdrich claimed that the HMO breached a fiduciary duty in making certain decisions. Under ERISA, in order for a person to be considered a fiduciary, he or she "must be someone acting in the capacity of manager, *administrator*, or financial adviser" to a plan. 120 S.Ct. at 2151. (emphasis added) The statute "defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to the plan." 120 S.Ct. at 2152. Thus, it was important for the Supreme Court to determine whether the acts in question by the HMO were administrative: because, if so, the HMO was acting as a fiduciary at that time.

It was in this context, then, that the court discussed the various sorts of decisions that an HMO may make, and whether such decisions are "administrative" acts within the meaning of ERISA. As noted above, the Third Circuit has discussed the dual role of an HMO: sometimes acting as an administrator by, for example, making benefit eligibility determinations, and sometimes acting as a medical provider by, for example, making medical treatment decisions. The Supreme Court's ap-

proach to the issue, however, was a little different. The Supreme Court acknowledged that an HMO will sometimes make "pure" eligibility decisions (which are clearly administrative decisions) and sometimes pure medical treatment decisions (which are not administrative). The court expanded this concept in a new way, however, by pointing out that, in many cases, these decisions are "practically inextricable from one another." 120 S.Ct. at 2154. In many cases, "eligibility decisions cannot be untangled from physicians' judgments about reasonable medical treatment." 120 S.Ct. at 2154. The Supreme Court concluded that in the case before it: [the HMO physician's] decision was one of that sort. She [the HMO physician] decided (wrongly, as it turned out) that Herdrich's condition did not warrant immediate action; the consequence of that medical determination was that [the HMO] would not cover immediate care, whereas it would have done so if Dr. Pegram [the HMO physician] had made the proper diagnosis and judgment to treat. The eligibility decision [that Ms. Herdrich was not covered for the diagnostic test at the local hospital] and the treatment decision [that Ms. Herdrich did not require immediate medical attention] were inextricably mixed, as they are in countless medical administrative decisions every day." 120 S.Ct. at 2154.

The court distinguished such "mixed" eligibility decisions from "pure" eligibility decisions "such as whether a plan covers an undisputed case of appendicitis." 120 S.Ct. at 2155. These pure eligibility decisions are "administrative" for purposes of ERISA. Where, however, there is an element of medical judgment involved, such decisions by an HMO are not made in an administrative capacity, and therefore not in a fiduciary capacity.

The United States Supreme Court considered the following example: assume that an ERISA plan provides that a plan participant is covered for treatment received at a hospital *outside* the HMO network only where such treatment is for emergency care. In *Pegram*, the Supreme Court pointed out that "an HMO's refusal to pay for emergency care on the ground that the situation giving rise to the need for care was not an emergency" is just such a mixed determination. Such an eligibility determination, mixed as it is with medical judgment, does *not* constitute "administering" the plan, and is therefore not made by the HMO in a fiduciary capacity.

The significance of this analysis toward ERISA preemption analysis now becomes apparent. In both circumstances, the key inquiry is whether the decisions under consideration were made by the HMO in its capacity as "administrator" to the plan. In the *Pegram* case before the United States Supreme Court, such a finding would lead to the conclusion that the HMO was acting as a fiduciary with regard to that particular decision. In ERISA preemption cases, such a finding would lead to the conclusion that the claim is preempted under section 514 of ERISA. Accordingly, because the United States Supreme Court has concluded that such mixed eligibility decisions are *not* administrative acts under ERISA, a state court tort claim against an HMO based upon such a mixed eligibility decision would likewise not be preempted by ERISA. The net effect of all of this, of course, is to reduce the opportunity for preemption. A decision by an HMO that might otherwise be thought to be administrative (and therefore give rise to preemption) is deemed not to be so where it is mixed with medical judgment.

In fact, the "emergency care" example used by the United States Supreme Court in *Pegram* not only illustrates that concept well, it also parallels the factual pattern before the Pennsylvania Supreme Court in *Pappas*. In *Pappas,* as set forth above, plan participants were generally required under the plan to receive their medical care only from doctors and hospitals within the HMO network—*i.e.,* from doctors and hospitals having contracts with the HMO. Emergency care, however, was an exception. In an emergency, participants were covered under the plan no matter where they received their medical care. In the *Pappas* case, as noted above, the emergency room physician determined that the situation before him was a neurological emergency. The physician requested the HMO, therefore, to approve Mr. Pappas's transfer to Jefferson Hospital, a facility outside the HMO network, but equipped and ready to treat Mr. Pappas. The HMO refused this request for authorization.

Such an eligibility determination by the HMO (that, under the plan, Mr. Pappas was not eligible for treatment at Jefferson) is clearly premised upon a medical determination (that Mr. Pappas's condition did not warrant emergency care). The United States Supreme Court concluded in Pegram that such a mixed determination does not involve the "administration" of a benefit plan. It follows that a state court medical malpractice claim challenging this mixed determination is not expressly preempted under section 514 of ERISA. Accordingly, the Pennsylvania Supreme Court's holding in *Pappas* is still good law.

Such a conclusion is also suggested by another section of the United States Supreme Court's analysis in

*Pegram.* In discussing the practical consequences of allowing mixed eligibility decisions by an HMO to form the basis of a fiduciary claim under ERISA, the court concluded that such a claim would simply duplicate remedies already available in a state court malpractice action:

"Thus, for all practical purposes, every claim of fiduciary breach by an HMO physician making a mixed decision would boil down to a malpractice claim, and the fiduciary standard would be nothing but the malpractice standard traditionally applied in actions against physicians.

"What would be the value to the plan participant of having this kind of ERISA fiduciary action? It would simply apply the law already available in the state court." 120 S.Ct. at 2157, 2158.

Thus, the U.S. Supreme Court appears to acknowledge that, in connection with certain claims against an HMO (such as those made in *Pappas*), a state court remedy is "already available." Such a remedy is "available," in state court, of course, only if it is not subject to preemption by ERISA. The logical conclusion, then, is that the U.S. Supreme Court does not intend such "mixed" claims against an HMO to be preempted by ERISA.

## IV.

Applying this analysis to the circumstances of the case before me, it becomes my task to determine whether the acts alleged to have been committed by the HMO in this medical malpractice case are administrative acts within the meaning of ERISA. In this regard, the complaint "must be parsed very carefully." See *Pegram*, 120 S.Ct.

at 2153. Of the four claims at issue, one is easily addressed. Plaintiff Janice Miller claims (in paragraph 110(j)) that the HMO was negligent in imposing such a patient workload on its physicians that the physicians could not adequately monitor their patients. This is a straightforward attack on the quality of the health care provided by the HMO. When an HMO makes staffing arrangements for the doctors who provide the actual medical treatment for the plan participants, the HMO is acting in its capacity as the "arranger" of medical treatment, and is not performing its administrative function. *Dukes*, 57 F.3d at 360. This claim is similar to the one at issue in *Dukes* (that the HMO was negligent in its selection and monitoring of doctors and hospitals) which the Third Circuit found *not* to be preempted. Accordingly, defendants preliminary objection to this claim is overruled.

The other three claims under review (paragraph 110(f), (g) and (1)) are more problematic. Here plaintiff attacks the internal policies of the HMO that tend to encourage participating physicians to optimize their financial gain by limiting patient referrals, by limiting laboratory tests and by limiting the care they provide to patients in general. Plaintiff does *not* allege, for example, that the HMO failed to make a particular patient referral or failed to order a particular lab test where such was medically required. Rather, plaintiff alleges that these policies, which provide the treating physicians with financial incentive to ration care, ispo facto constitute medical negligence.

As it happens, the United States Supreme Court took up this subject in a general way in *Pegram*. In *Pegram*, as in this case, the plaintiff alleged that the terms of the

HMO created a financial incentive for the treating physicians to limit medical care, to limit diagnostic tests, and to limit patient referrals. In *Pegram,* plaintiff further alleged that because these HMO policies created an incentive for the physicians to act in his or her self-interest rather than the patient's interest, an inherent breach of fiduciary duty occurred.

In addressing that issue, the United States Supreme Court stated that it was first necessary to provide "some background of fact and law about HMO organizations" as follows:

"Traditionally, medical care in the United States has been provided on a 'fee-for-service' basis. A physician charges so much for a general physical exam, a vaccination, a tonsillectomy, and so on. . . . In a fee-for-service system, a physician's financial incentive is to provide more care, not less, so long as payment is forthcoming. . . .

"Beginning in the late 1960s, insurers and others developed new models for health care delivery, including HMOs. The defining feature of an HMO is receipt of a fixed fee for each patient enrolled under the terms of the contract to provide specified health care if needed. The HMO thus assumes the financial risk of providing the benefits promised: if a participant never gets sick the HMO keeps the money regardless, and if the participant becomes expensively ill, the HMO is responsible for the treatment agreed upon even if its costs exceed the participant's premiums." 120 S.Ct. at 2148, 2149.

"Like other risk-bearing organizations, HMOs take steps to control costs . . . .

"These cost-controlling measures are commonly complemented *by specific financial incentive to physicians, rewarding them for decreasing utilization of health care services, and penalizing them for what may be found to be excessive treatment.* Hence, in an HMO system, a physician's financial interest lies in providing less care, not more. The check on this influence (like that on the converse, fee-for-service incentive) is the professional obligation to provide covered services with a reasonable degree of skill and judgment in the patient's interest." 120 S.Ct. at 2149.

In *Pegram,* the plaintiff argued that the HMO's financial incentive scheme was particularly egregious. The HMO in that case was actually owned by the treating physicians. The year-end bonuses to these physician owners were thus directly increased to the extent that the physicians rationed care to their patients. Plaintiff argued that "this particular incentive device of annually paying physician owners the profit resulting from their own decisions rationing care can distinguish [that HMO] from HMOs generally. . . ." 120 S.Ct. at 2150.

The United States Supreme Court disagreed, stating that the question of whether a particular set of HMO financial incentive policies are good or bad is not an issue for the courts to decide:

*"Since inducement to ration care goes to the very point of any HMO scheme, and rationing necessarily raises some risks while reducing others* (ruptured appendixes are more likely; unnecessary appendectomies are less so), any legal principle purporting to draw a line between good and bad HMOs would embody, in effect, a judgment about socially acceptable medical risk.

*"But such complicated fact-finding and such a debatable social judgment are not wisely required of courts unless for some reason resort cannot be had to the legislative process,* with its preferable forum for comprehensive investigations and judgments of social value, such as optimum treatment levels and health care expenditure." 120 S.Ct. at 2150.

In the case before me, plaintiff Janice Miller has alleged that the particular financial incentive policies of this HMO are themselves medical negligence. However, as the United States Supreme Court noted, "inducement to ration care goes to the very point of any HMO scheme," and the wisdom of such a health-delivery scheme is not a matter to be decided by a court. Therefore, this is not a matter to be decided by a court through a medical malpractice action.

Accordingly, I shall sustain defendants' preliminary objections to these allegations.[2]

For the foregoing reasons, I am this date entering the following order.

### ORDER

And now, December 12, 2000, upon consideration of the preliminary objections to the amended complaint filed on behalf of defendant HealthAmerica Pennsylvania Inc.,

---

2. The fact that these financial incentive policies do not themselves constitute medical negligence is not to say, however, that examination and testimony regarding them are inadmissible. If, for example, a plaintiff contends that a physician was negligent in failing to order a particular diagnostic test, it would seem to me relevant that the physician has a financial incentive not to order the test.

and after argument thereon, it is hereby ordered, adjudged and decreed as follows:

Defendant HealthAmerica's preliminary objections to paragraph 110(j) of plaintiff's complaint are overruled. Defendant HealthAmerica's preliminary objections to paragraphs 110(f), (g) and (1) of plaintiff's complaint are sustained.